J-A01011-18
J-A01012-18
J-A01046-18
J-A01047-18

2018 PA Super 119

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 154 EDA 2017 |

Appeal from the Order December 8, 2016
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0000856-2016,
FID: 51-FN-000792-2016

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 190 EDA 2017 |

Appeal from the Order Entered December 8, 2016
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000856-2016

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: N.W.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3714 EDA 2017 |

Appeal from the Decree Entered October 26, 2017

J-A01011-18
J-A01012-18
J-A01046-18
J-A01047-18

In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000573-2017,
CP-51-DP-0000856-2016

\*\*\*\*\*

| | |
|---|---|
| IN THE INTEREST OF: N.W.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., MOTHER | |
| | No. 3715 EDA 2017 |

Appeal from the Decree Entered October 26, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000573-2017,
CP-51-DP-000856-2016

BEFORE:   LAZARUS, J., OTT, J., and PLATT\*, J.

OPINION BY LAZARUS, J.:                    **FILED MAY 04, 2018**

J.C. (Mother) and N.M. (Father) (collectively, Parents) appeal from the trial court's permanency orders[1] designating reunification with Parents or guardian as the current placement goal, declining to reunify Parents with their

---

[1] We have *sua sponte* consolidated Mother's and Father's appeals, 154 EDA 2017 & 190 EDA 2017 and 3714 EDA 2017 & 3715 EDA 2017, as they are taken from the same orders and involve the same issues.  **See** Pa.R.A.P. 513 (Consolidation of Multiple Appeals).

\*Retired Senior Judge Assigned to the Superior Court.

- 2 -

minor daughter, N.M. (born 2/16), or place N.M. in kinship care, and maintaining the status quo with N.M. in foster care and mandating that N.M. stay in foster care "until there's a determination as to the cause of [N.M.'s] injury."[2]  Parents also appeal from the trial court's subsequent decrees changing the goal to adoption and involuntarily terminating[3] their parental

_____

[2] N.T. Permanency Review Hearing, 12/8/16, at 34.

[3] As noted in the procedural history of this opinion, on October 26, 2017, the trial court changed the goal from reunification to adoption and involuntarily terminated Parents' parental rights to N.M. in response to DHS's May 23, 2017 involuntary termination petition.  Parents have appealed that decision, which we have chosen to consolidate with this matter.  **See infra** n.1; **see also In re:  N.M.**, 3714 EDA 2017 & 3715 EDA 2017.  Notably, a court-ordered goal change is not a condition precedent to the filing of a petition to terminate parental rights.  **See In re Adoption of S.E.G.**, 901 A.2d 1017 (Pa. 2006).  On January 18, 2018, this Court stayed the order changing the goal to adoption and terminating Parents' rights.  Our Court also reinstated parental visitation until resolution of the current appeal.

We also recognize that the trial court had jurisdiction to address the petition to terminate Parents' parental rights while the appeals of the current permanency review orders were pending. The appeals of the permanency review orders addressed Parents' rights to reunification with N.M. and a change of her placement to kinship care, which is a separate issue from whether Parents' rights should be terminated.  **See** Pa.R.A.P. 1701(c) ("Where only a particular item, claim or assessment adjudged in the matter is involved in an appeal, . . . the appeal . . . shall operate to prevent the trial court . . . from proceeding further with only such item, claim or assessment, unless otherwise ordered by the trial court or other government unit or by the appellate court or a judge thereof as necessary to preserve the rights of the appellant.").

rights to N.M.[4]   After careful and deliberate consideration, we reverse and vacate.

On April 12, 2016, seven-month-old N.M. and her then-two-year-old brother, E.M., were removed from Parents'[5] care based on allegations of physical abuse to N.M.   Mother took N.M. several times to the pediatrician when N.M. exhibited signs of increased fussiness.   On the first occasion, the morning of April 6, the pediatrician diagnosed N.M. with an ear infection and prescribed an antibiotic.   Immediately following that doctor's appointment, Mother was at a play date with N.M. and felt a "popping on [N.M.'s] side."   Mother returned to the pediatrician's that afternoon; the doctor could not feel the "popping" and told Mother the fussiness was from N.M.'s ear infection.   When N.M.'s heightened fussiness failed to decrease that evening, Father took N.M. back to the pediatrician the next morning, April 7; the pediatrician ordered an outpatient chest x-ray.   Parents took N.M. to the Children's

---

[4] Due to the interrelated procedural history as well as the fact that the parties and issues are the same in the matters, we have chosen to consolidate Parents' permanency appeals and termination appeals.  *See In the Interest of M.T.*, 101 A.3d 1163 (Pa. Super. 2014) (where goal change issues and termination issues in separately filed appeals were interrelated and implicated trial court's assessment of sufficiency and weight of evidence, our Court properly addressed issues together).

[5] Mother is a nurse practitioner at the Hospital of the University of Pennsylvania; Father is a graphic designer.

Hospital of the University of Pennsylvania (CHOP) that same day; x-ray results yielded mildly displaced acute fractures of her sixth and seventh left posterior ribs.[6] N.M. was admitted to CHOP for a magnetic resonance imaging (MRI) and consultation with a team of doctors. The CHOP medical team identified the primary concern as non-accidental trauma and determined that N.M.'s injuries were not likely due to any genetic or metabolic causes.

A report was filed with the Philadelphia Department of Human Services (DHS) on the day of N.M.'s admission to CHOP, April 7, 2016. N.M. was discharged from CHOP on April 12, 2016. On July 7, 2016, the court held an adjudicatory hearing where Natalie Jenkins (a DHS social worker), Mother, and Dr. Natalie Stavas (a CHOP pediatrician with a concentration in child abuse cases) testified. Doctor Stavas opined that nothing was provided to the CHOP team that would explain N.M.'s rib fractures, that it would be very unlikely that E.M., a toddler and N.M.'s older brother, would be able to inflict the force necessary to fracture N.M.'s ribs, and that blood tests and lab work did not

---

[6] At a follow-up appointment on April 21, 2016, it was noted that "[N.M.'s] repeat skeletal survey . . . show[ed] healing of the prior known fractures *as well as likely nondisplaced healing fracture of the posterior left fifth rib* ([that] would be consistent with the same time frame as the previously identified fractures), more visible now on follow-up imaging in the setting of ongoing healing." CHOP Visit Summary, 4/21/16.

uncover any genetic disorders to explain the fractures.[7]  Social workers testified that Parents, individually, gave consistent stories with regard to the events leading up to discovering N.M.'s injuries, noting that Parents are the sole caregivers for N.M., the family home was extremely safe, and E.M. is never around N.M. unsupervised.  Finally, Mother testified that she had no idea how N.M.'s injuries occurred, but that E.M. would often forcefully run into N.M.'s back when Mother was holding N.M. in her arms.  ***Id.*** at 136.

At the conclusion of the hearing, N.M. was adjudicated dependent[8] based on the two unexplained acute rib fractures diagnosed at CHOP; she was placed in the custody of DHS.  DHS determined the abuse allegations to be founded and identified Parents as the perpetrators.[9]

_____

[7] Interestingly, Dr. Stavas testified that genetic testing showed a variant or mutation that was "unlikely to contribute to the health of [N.M.'s] bones [but she] could not make a definitive statement as to whether or not it contributed to her fractures."  N.T. Adjudicatory Hearing, 7/7/16, at 53.  Doctor Stavas, however, did testify definitively that N.M. does not have osteogenesis imperfect (OI), which is also known as brittle bone disease, a genetic disorder that mainly affect the bones and results in bones that break easily.

[8] Once a child has been adjudicated dependent, the issue of custody and continuation of foster care are determined according to a child's best interest. ***R.P. v. L.P.***, 957 A.2d 1205 (Pa. Super. 2008).

[9] As part of a dependency adjudication, a court may find a parent to be the perpetrator of child abuse, as defined by the Child Protective Services Law (CPSL). ***In re L.Z.***, 111 A.3d 1164, 1176 (Pa. 2015).  The CPSL defines "child abuse" in relevant part as follows:

N.M. was placed in foster care and E.M. was placed in approved kinship care with his paternal grandmother, pursuant to an emergency protective custody order.  Importantly, no aggravated circumstances were found.  The trial court ordered Parents each to submit to a behavioral health evaluation, complete parenting classes and attend individual therapy.  On the same date, E.M. was adjudicated dependent with supervision[10] and he was **reunified** with Parents.

_____

> The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> > (1)    Causing bodily injury to a child through any recent act or failure to act.
> >
> > \*    \*    \*
> >
> > (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1)(1), (5).  The CPSL defines "child" as "[a]n individual under 18 years of age."  23 Pa.C.S. § 6303(a).  "[B]odily injury" is defined under the CPSL as "[i]mpairment of physical condition or substantial pain." *Id.* at § 6303(a).

[10] Pursuant to 42 Pa.C.S. § 6341(a):

> [A] court is empowered . . . to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, *including allowing the child to remain with the parents subject to supervision*, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state.

On August 18, 2016, at an initial permanency review hearing, the court discharged E.M.'s dependency petition and supervision, finding that Parents had the protective capacity to care for E.M. and that E.M. was safe in Parents' home. N.M., however, remained in foster care; the court refused Parents' request to have N.M. placed in kinship care. The court further ordered that Parents have supervised visits with N.M. and that DHS refer Parents for an "expedited" parenting capacity evaluation.

On December 8, 2016, the court held a permanency review hearing. At the hearing, the court acknowledged that Parents had fully complied with their service plan objectives. In coming to its decision to keep N.M. in foster care and not reunite her with Parents or place her in kinship care, the court made the following statements on the record:

> So, you know what, if we're going to stay stuck, we're going to stay stuck. **Because either someone has to cop to it or there has to be a plausible explanation with the significance of the injuries to [N.M.] because I'm telling you that testimony by the doctor was so damning.** She sealed any doubt, any variable that it could be anything but abuse.

*     *     *

---

42 Pa.C.S. § 6351(a). **See In re D.A.**, 801 A.2d 614, 617 (Pa. Super. 2002) (en banc) (emphasis added).

- 8 -

> So, I don't know how we get over this hurdle. I'm definitely not going to allow supervised visits in the parent's home because I need line of sight, line of hearing. As far as I'm concerned . . . this is still an open investigation.[11] **Until we get some closure about how this happened, we're not going to get beyond this. I can't look the other way on that. I just can't. . . . [U]nless somebody is willing to say, "This is how [N.M.] got injured," [N.M.] can't come back to that home because I can't risk it a second time and a worse injury.** I can't do it. And we don't have any explanations.
>
> So, I don't know what you want me to do. I'm open to any suggestions to try to move this forward to reunification, but that's the bottom line. We can talk about services and how parents are fully compliant. **I'll find that the parents are fully compliant. It doesn't move the needle for me**. We came in because a baby was injured. And the thing that brought this case into [court] still exist[s] with no explanation. **Can't do reunification if that's the case.**
>
> \* \* \*
>
> We had the child abuse hearing. At some point in time if it's going to move the needle[,] I would allow the doctor to testify today. I would. I would. I absolutely would.

---

[11] To date, no criminal proceedings have been instituted against Parents regarding the abuse to N.M. Despite the trial judge's statement in her August 10, 2017 opinion that at the July 7, 2016 adjudicatory hearing "the Court found child abuse aggravated circumstances existed," in fact, DHS did not pursue a finding of aggravated circumstances. **See** N.T. 7/7/16, at 17 ("It is not my expectation to . . . pursue aggravated circumstances at this time."); **id.** at 19 ("I'm not requesting the aggravating finding."). Under 42 Pa.C.S. § 6315(e)(2), "*If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist.*"). Thus, it is a condition precedent that either the county agency or child's attorney allege aggravating circumstances before a trial court can make such a determination.

*    *    *

And as the [c]ourt I will be open and receptive to anything you bring for me. That's why I'm not saying no if they had a geneticist come in and say, "This is where we are."

I'm willing to receive that, but, until such time I can't do anything because the bottom line is I have to ensure the child's safety.

*    *    *

**I guess the other side of the conversation is if I leave her [in foster care] maybe I get closer to an answer as to what happened instead of moving her to grandmom. . . . So, I'm not going to consider kinship care.**

N.T. Permanency Hearing, 12/8/16, at 14-16, 20, 22, 29-30 (emphasis added).[12] Mother and Father filed timely notices of appeal and court-ordered Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal.

While the permanency matter was pending on appeal, the trial court held further hearings in the matter on March 9, 2017, May 23, 2017, July 11, 2017 and October 26, 2017. At the March 2017 hearing, Attorney Marc Freeman entered his appearance as co-counsel[13] for Mother, *see* N.T. Dependency Hearing, 3/9/17, at 5, and attempted to admit two expert medical reports to explain N.M.'s injuries. *Id.* at 8. **The court, however, would not permit Mother to have two attorneys,** *id.* at 10, **found Attorney**

---

[12] Parents continued to engage in both individual and couple's therapy. Parents successfully graduated from Family School in July 2017.

[13] Claire Leotta, Esquire, was counsel of record for Mother.

**Freeman's conduct "disrespectful [a]nd a little arrogant,"** *id.* at 13, **refused to take any testimony in the case,** *id.* at 19, **and ordered the parties to work on how evidence will be presented in the case.** (Emphasis added).

At the May 23, 2017 hearing, Attorney Freeman was listed as counsel for Mother. With regard to permanency matters, the court chose to only hear evidence regarding "where N.M. is, . . . is she receiving services, [and] was she last seen in 30 days." N.T. Hearing, 5/23/17, at 26. **The court again refused to accept from Attorney Freeman the reports and curriculum vitae of two doctors regarding a non-abusive explanation for N.M.'s injuries.** *Id.* at 41. The focus of the court's time was spent on addressing outstanding motions in the case. *Id.* at 26-27.[14] Ultimately, the court ruled that: (1) any grandparent visitation with N.M. is immediately suspended; (2) it is not in N.M.'s continued best interests to explore placement in kinship care; and (3) supervised, line-of-sight parental visitation was continued. *Id.* at 35, 37-39, 42. With regard to kinship care, the court determined it was not to be explored despite DHS social worker Molly McNeil testifying that she had conducted a full investigation on kinship care for N.M., that DHS had

---

[14] Specifically, the court referenced a motion to remove an attorney from the City Solicitor's Office from the case. The court, however, determined that it did not have jurisdiction over the matter because it was brought in an improper forum.

approved paternal grandmother as a willing kinship provider, and that DHS would explore her as a kinship provider. *Id.* at 31-32. Following the hearing, DHS filed petitions to change the goal to adoption and to involuntarily terminate Parents' rights to N.M.[15]

At the July 11, 2017 hearing, the court ruled on several motions from the prior listing. Specifically, the court denied the request to have N.M. seen by an out-of-state physician for additional medical testimony in the case, noting that the child abuse finding, which was substantiated by a doctor at the July 2016 adjudicatory hearing, was never challenged by Parents. The court also denied a request to have witnesses appear via video feed. The court excluded Parents' expert reports from Doctors Haluck and Mack,[16] again

---

[15] On August 17, 2017, our Court denied Parents' motion to stay the termination hearing until resolution of their permanency appeals. However, on December 1, 2017, our Court granted Parents' motion to stay the termination and goal change orders and reinstated Parents' visitation pending resolution of the instant matter. *See* Order, Nos. 3714 & 3715 EDA 2017 (filed 12/1/17). Our Court further ordered that reinstated visitation begin no later than the week of January 29, 2018, permitting Parents four hours of supervised visitation at the agency per week, modifiable by agreement of the parties. Order, Nos. 3714 & 3715 EDA 2017 (filed 1/18/18).

[16] At the hearing, Attorney Freeman told the trial judge that he had a radiologist and endocrinologist to offer testimony in the matter. N.T. Hearing, 7/11/17, at 43. The court prevented the experts from testifying, noting that the child abuse finding was final and that the only new evidence the court would allow in would be something "that could not have been obtained at the time of the adjudicatory hearing in July 2016 . . . [and would be something]

- 12 -

noting that the child abuse finding was final and had not been timely challenged.[17] Finally, the court denied Parents' motion to quash DHS's subpoena for their treatment records, finding that Parents had signed consent forms waiving any potential psychotherapist-patient privilege. In concluding the hearing, the court pronounced the following:

> Let me just say this and let me be **clear**: this matter is going to be heard for a contested goal change termination on 10/26/2017. That means **by September 26, 2017, there should be an exchange of all exhibits amongst parties that are to be – that will be used in anticipation of the next court date. That would also include witness lists. So if there's experts, CVs, whatever you need should be produced to all parties by September 26th** and that gives you 30 days in anticipation of the next court date.

N.T. Hearing, 7/11/17, at 59 (emphasis in original and emphasis added).

On October 26, 2017, the court held a goal change/termination hearing, after which it granted DHS' petitions and involuntarily terminated Parents' rights to N.M. pursuant to sections 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[18] The court largely based its decision to terminate under section 2511(a) on the fact that Parents had refused to comply with the service plan objective of receiving appropriate mental health treatment to "address [and]

---

unusual and [that] nobody could have foreseen that that would have been the case in July 2016." **Id.** at 45.

[17] **See L.Z.**, **supra** n.7 (finding of child abuse in dependency proceeding can be appealed to Superior Court).

[18] 23 Pa.C.S. §§ 2101-2910.

understand the reason or cause of N.[]M.'s physical injuries." Trial Court Opinion, 2/9/18, at 7. On November 17, 2017, Parents filed timely notices of appeal and Pa.R.A.P. 1925(a)(2)(i) concise statements of errors complained of on appeal.

On appeal from the permanency orders, Mother and Father present the following issues for our consideration:

(1)     Whether the trial court erred and/or abused its discretion by entering an order on December 8, 2016 denying Mother & Father reunification with N.M.? More specifically, the trial court abused its discretion as substantial, sufficient and credible evidence was presented at the time of trial indicating Mother [and] Father were fully compliant with all of their goals and the Court indicated that finding on the record, yet ordered that the case remain "status quo".

(2)     Whether the trial court erred and/or abused its discretion by entering an order on December 8, 2016 denying counsel's repeated requests to have N.M. moved to a kinship care home rather than continue to reside in general foster care? More specifically, the trial court abused its discretion by not following State [and] Federal Laws regarding kinship care placement of children when substantial, sufficient and credible evidence was presented to the Court indicating that an approved family member was ready and available to care for N.M.

(3)     Whether the trial court erred and/or abused its discretion by violating the protections of the Due Process Clause as guaranteed by both the Pennsylvania Constitution and the United States Constitution by halting the stated goal of reunification, without appropriate notice to Mother and Father of the Court's change in the Permanency Plan, thus denying Mother and Father notice and an opportunity to prepare and be heard on such issue?

- 14 -

On appeal from the goal change/termination decrees, Parents present the following issues for our consideration:

(1)     Whether the [t]rial [c]ourt erred and/or abused its discretion by denying Parents['] Motion to Recuse Judge Younge?

(2)     Whether the [t]rial [c]ourt erred and/or abused its discretion when it excluded testimony from the Parents' licensed therapists?

(3)     Whether the [t]rial [c]ourt erred and/or abused its discretion when it found clear and convincing evidence that the individual and couples therapy in which Parents were engaged in failed to comply with the Permanency Plan?

(4)     Whether the [t]rial [c]ourt erred and/or abused its discretion when it excluded evidence that N.[]M.'s sibling[,] E.M.[,] had been returned to Parents' custody and E.M. had been deemed safe in Parents' care?

(5)     Whether the [t]rial [c]ourt erred and/or abused its discretion by entering an order that no family members be explored for N.[]M.'s placement, despite counsel's repeated requests to have N.[]M. moved to approved kinship care home rather than continue to reside in general foster care?

(6)     Whether the [t]rial [c]ourt erred and/or abused its discretion in finding DHS met its burden by clear and convincing evidence that Parental rights to N.[]M. should be involuntarily terminated and the goal changed[19] to adoption?

_____

[19] We have described our standard and scope  of review in dependency cases as follows:

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and

Appellants' Briefs, at 9.

Before reviewing the merits of Parents' issues, we must determine whether we have jurisdiction over the appeals in the permanency matter. In particular, we must examine whether the permanency review orders of December 8, 2016, are appealable orders. **See Kulp v. Hrivnak**, 765 A.2d 796, 798 (Pa. Super. 2000) ("[W]e lack jurisdiction over an unappealable order, it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order."). It is well-settled that, "[a]n appeal lies only from a final order, unless permitted by rule or statute." **Stewart v. Foxworth**, 65 A.3d 468, 471 (Pa. Super. 2013). Generally, a final order is one that disposes of all claims and all parties. **See** Pa.R.A.P. 341(b). Moreover, with regard to dependency matters, "[a]n order

---

conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination as opposed to the findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

**In re D.P.**, 972 A.2d 1221, 1225 (Pa. Super. 2009) (quoting **In re C.M.**, 882 A.2d 507, 513 (Pa. Super. 2005)). In considering a goal change, "the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." **Id.** at 1227 (citing **In re A.K.**, 936 A.2d 528, 532-533 (Pa. Super. 2007)).

- 16 -

granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered." ***In re H.S.W.C.-B.***, 836 A.2d 908, 910 (Pa. 2003).

Here, the trial court did not grant or deny a status change; the goal remained reunification throughout and Parents never asked for it to be changed. Moreover, the instant permanency orders neither affected visitation nor custody. ***See id.*** (noting that all orders dealing with visitation or custody, with exception of enforcement or contempt proceedings, are final when entered.). Rather, the sole request Parents made at the permanency review hearing was to remove N.M. from foster care and place her in kinship care, which amounts to a request to change placement.[20] That request was denied.

_____

[20] Kinship care under 62 P.S. § 1303(b) is a subset of foster care in which the care provider already has a close relationship to the child. In kinship care, legal custody of the child remains with the agency, and the agency places the minor child with an appropriate caregiver, who is typically a family member. The court may place children with a foster family, although there might be willing relatives, where foster care is in the best interests of the children or aggravated circumstances exist. The goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of children, but must be weighed in conjunction with other factors. Section §1303(b) of the Kinship Care Program provides as follows:

> (b) Placement of children.— If a child has been removed from the child's home under a voluntary placement agreement or is in the legal custody of the county agency, the county agency shall give first consideration to placement with relatives. The county agency shall document that an attempt was made to place the child with

In *In re H.S.W.C.-B.*, *supra*, the Supreme Court granted review to determine whether an order denying a petition to change a family goal from reunification to adoption and to terminate parental rights was final, and therefore, appealable. In that case, two children were adjudicated dependent and placed in foster care. The court approved reunification as the goal, provided mother continued to make efforts toward satisfying a family service plan. After two years of permanency review hearings and mother's minimal gains toward achieving her service goals, CYS filed petitions to change the goal from reunification to adoption and to involuntarily terminate mother's parental rights. The court denied the petitions, without prejudice. CYS appealed the decision to our Court; the trial court stayed all proceedings below until the appeal was decided. Our Court quashed CYS's appeal, holding that the order merely maintained the *status quo*, was not final, and, thus, was unappealable. On appeal, the Supreme Court noted that, generally, a change of placement goal is not appealable. However, the Court also recognized that orders that are not status-changing, such as orders denying parental

a relative. If the child is not placed with a relative, the agency shall document the reason why such placement was not possible.

62 P.S. § 1303(b).

- 18 -

termination, have been regularly reviewed on appeal.  *See In the Interest of A.L.D.*, 797 A.2d 326 (Pa. Super. 2002) (all decrees in termination of parental rights cases, whether granting them or denying them, are considered final, appealable orders).[21]  Unlike the mother in *H.S.W.C.-B.*, who requested a *goal* change, Parents here requested a placement change – from foster care to kinship care.  Thus, we do not find *H.S.W.C.-B.* controlling.

Case law has supported the argument, however, that certain interlocutory, non-final permanency orders are appealable as collateral order under Pa.R.A.P. 313(b).  *Compare In re:  N.E.*, 787 A.2d 1040 (Pa. Super. 2001) (collateral order where DHS appealed from order requiring it pay portion of dependent child's dental bills); *In re:  Tameka M.*, 580 A.2d 750 (Pa. 1990) (CYS's appeal from order requiring it reimburse foster family for expenses in sending child to private preschool is collateral order) *with In re H.K.*, 161 A.3d 331 (Pa. Super. 2017) (right to participate and present evidence during dependency proceedings is not separate from, or collateral

---

[21] In *H.S.W.C.-B.*, *supra*, the Court noted that "[m]aintaining the status quo[, by denying goal changes,] could put the needs and welfare of a child at risk."  *Id.* at 911.  "Foster care may be the *status quo*, but to 'allow these children to languish in foster care . . . not only defies common sense, but it is contradictory to the applicable law and to the best interest of the children.'" *In re R.T.*, 778 A.2d 670, 681 (Pa. Super. 2001).  In *R.T.*, parents had been provided services by CYS for "eight fruitless years," and had been "[unable] or refus[ed] to complete the goals on their Placement Plan Amendments."  *Id.* at 682.  Again, the *status quo* in these cases involved goals, not placement.

to, those proceedings); *In re J.S.C.*, 851 A.2d 189 (Pa. Super. 2004) (order granting parent's petition to compel visitation not collateral order where CYS did not possess "right" to prevent parent from visiting with child).

However, to be considered a collateral order, the order must be separable from and collateral to the main cause of action, where the right involved is too important to be denied review, and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost. *See* Pa.R.A.P. 313(b). Here, we do not find that the instant permanency order is separable from or collateral to the main cause of action where the only request was to change the placement of N.M. (from foster care to kinship care) and where the placement remained the same. Moreover, review of that decision will not be irreparably lost if we postponed it at this point.

We conclude, however, that because the trial court has terminated Parents' parental rights to N.M., the entire record from the permanency hearings, including that from the December 8, 2016 hearing, is now reviewable on appeal from the court's termination decrees. *See In the Interest of A.L.D.*, *supra* (all decrees in termination of parental rights cases are considered final, appealable orders). Procedurally, the entry of the orders terminating Parents' rights to N.M. acts to finalize the interlocutory

permanency review orders.  Therefore, we will address the merits of the claims raised in these consolidated appeals.

In their first two issues in the permanency appeals, Parents contend that the court erred by not reunifying them with N.M. and in denying their repeated requests to have N.M. placed into kinship care.

At permanency hearings,[22] the court is required to comply with 42 Pa.C.S. § 6351(f), which designates the appropriate matters to be determined at such hearings, including:

---

[22] Under section 6351:

> (e)  Permanency hearings.
>
> (1) The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-

**(1) The continuing necessity for and appropriateness of the placement.**

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

**(4) The appropriateness and feasibility of the current placement goal for the child.**

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

_____

appointed special advocate or other person as designated by the court.

42 Pa.C.S. § 6351(e)(1). The court shall conduct permanency review hearings "[w]ithin six months of the date of the child's removal from the child's parent[;] or each previous permanency hearing until the child is returned to the child's parent, guardian or custodian or removed from the jurisdiction of the court." *Id.* at (e)(3)(i)(A). The court shall also conduct permanency hearings "[w]ithin 30 days of a petition alleging that the hearing is necessary to protect the safety or physical, mental or moral welfare of a dependent child." *Id.* at (e)(3)(ii)(D).

- 22 -

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

* * *

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

*Id.* at (f) (emphasis added). Moreover, based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

**(1)** If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best

- 23 -

> suited to the safety, protection and physical, mental and moral welfare of the child.
>
> **(2)** If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.
>
> **(3)** If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.
>
> **(4)** If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

*Id.* at (f.1). On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child. *Id.* at (g).

Instantly, N.M. was removed from Parents' care on April 12, 2016, and adjudicated dependent on July 7, 2016. She had been in placement for 5 months at the time of the December 2016 placement hearing and for more than 15 months at the time of the October 2017 termination/goal change hearing. N.M. is now two years old. While a CHOP pediatrician testified at the adjudicatory hearing in July 2016 that nothing was provided to the CHOP team that would explain N.M.'s rib fractures, Mother did testify that E.M. would often forcefully run into N.M.'s back when Mother was holding N.M. in her

arms. Doctor Stavas testified that it would be very *unlikely* that E.M., a toddler, would be able to impart the necessary force to fracture N.M.'s ribs; however, that does not completely rule out the possibility. Moreover, while the results of N.M.'s blood tests and lab work did not uncover any specific genetic disorders to explain the fractures, testing showed that N.M. has a genetic variant that, while unlikely to contribute to the her bone health, could not be definitively ruled out by Dr. Stavas[23] as contributing to her fractures, noting that the mutation is "not in the literature."[24] *See* N.T. Adjudicatory Hearing, 7/7/16, at 84. Parents' stories regarding the events leading up to discovering N.M.'s injuries were internally consistent; they have remained consistent to date. *Cf. In the Interest of J.R.W.*, 631 A.2d 1019 (Pa. Super.

_____

[23] Andrew C. Edmondson, MD, PhD, a geneticist fellow at CHOP, issued a progress note on May 3, 2016, concluding that her genetic mutation (LEPRE1), *see infra* n.24, is inconsistent with the inheritance pattern of the recessive form of OI and that her fractures do not fit with the described phenotype of individuals with recessive OI due to that type of mutation. Thus, he opined, that "this change is most likely a neutral variant [and] does not explain her clinical presentation." Progress Notes of Andrew C. Edmondson, MD, PhD, 5/3/16, at 1.

[24] Genetic testing revealed that N.M. has a gene, LEPRE1, that affects collagen modification and produces prolyl 3-hydroxylase 1 (P3H1). P3H1 interacts with collagen and modifies amino acids in the collagen chains. *Recessive Forms of OI*, Osteogenesis Imperfecta Foundation (May 2007). Although Dr. Stavas testified that N.M. does not have OI, *see* N.T. Adjudicatory Hearing, 7/7/16, at 84, defects in P3H1 appear to account for most of the cases of severe/lethal OI which do have biochemically abnormal collagen, but do not have a collagen mutation. In fact, recessive OI has been discovered only in individuals with lethal, severe or moderate OI. *Recessive Forms of OI*, *supra*. *See supra* n.7.

1993) (child abuse case where parents provided various, inconsistent reasons for child's life-threatening injuries). Thus, the court's strategy of denying kinship care and leaving N.M. in foster care to force Parents to explain the root cause of her injuries has not been a winning one. *See In re: L.Z.*, 111 A.3d 1164, 1171 (Pa. 2015) (recognizing dissent in prior appeal that observed "child abuse cases often involve 'an apparent conspiracy of silence,' where all the parents and caregivers refuse to explain who was responsible for the child at the exact moment of injury.").

At the conclusion of the July 7, 2016 adjudicatory hearing, the trial court noted that parents were fully compliant with their objectives, however, it ordered N.M. remain in foster care "until the cause of N.M.'s injury was determined" and "until the Court [is] advised of an explanation of N.M.'s injuries while in the care of Mother and Father." Trial Court Opinion, 8/10/17, at 4.

While Parents did not challenge the court's July 2016 finding[25] of child abuse,[26] the court acknowledged that parents submitted to all requested evaluations, parenting classes, and therapy. DHS referred Mother to have a parenting capacity evaluation completed. On October 17, 2016, Doctors William Russell, Ph.D., and Sheetal A. Duggal, Psy.D., examined Mother to "assess [her] ability to provide safety and permanency to her daughter[, N.M.]." Report of Forensic Evaluation, 10/17/16, at 1. In that report, Doctors Russell and Duggal opined that if Parents followed their recommended course

_____

[25] Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-75. However, the Child Protective Services Law (CPSL) controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. **See In the Interest of J.R.W.**, 631 A.2d 1019 (Pa. Super. 1993). The CPSL, defines, in part, a "founded report," where there has been a judicial adjudication that includes a "finding of dependency under 42 Pa.C.S. § 6341 (relating to adjudication) if the court has entered a finding that a child who is the subject of the report has been abused." 23 Pa.C.S. § 6303(a)(1)(iii). "Child abuse" is defined, in part, under the CPSL as "intentionally, knowingly or recklessly . . . [c]ausing bodily injury to a child through any recent act or failure to act." **Id.** § 6303(b.1)

[26] Under the Juvenile Act, courts employ a *prima facie* evidentiary standard in making a legal determination as to the identity of the abuser in child abuse cases. **See** 23 P.S. § 6381(d) ("Evidence that a child has suffered serious physical injury, sexual abuse or serious physical neglect of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child."). However, there must still be clear and convincing evidence to establish that the child was abused. Moreover, a finding of child abuse under the Juvenile Act is not the same as a finding of guilt in a criminal proceeding.

of treatment, joint couples' counseling individual therapy, and medication protocols, "[Parents] should be able to provide safety and permanency to [N.M.]" Parenting Capacity Evaluation Report, 10/17/16, at 14.

At the December 2016 permanency hearing, the court denied Parents' requests to be reunified with N.M. or to place her in kinship care. The court expressed "grave concerns" about the safety of N.M. if moved into kinship care. The court found Mother lacked credibility at the abuse hearing, and that it could not reunify N.M. with Parents while "the thing that brought this case into [court] still exist[s] with no explanation." N.T. Permanency Hearing, 12/8/16, at 16. Finally, the trial judge noted that if it left N.M. in foster care "maybe [she] would get closer to an answer as to what happened instead of moving [N.M.] with grandmom." *Id.* at 29.

While reunification with Parents may not have been appropriate following the December 2016 permanency review hearing, the court's reason for not at least placing N.M. in kinship care is unsupported by the evidence of record and, thus, was an abuse of discretion.[27] *See In the Interest of M.T.*,

_____

[27] In *In re R.R.*, 686 A.2d 1316 (Pa. Super. 1996), we noted:

> It is true that in furtherance of its goal of preserving family unity whenever possible, 42 Pa.C.S. § 6301(b) of the Juvenile Act requires clear and convincing evidence of dependency before the court can intervene in the relationship between a parent and child. *In the Interest of R.T.*, [] 592 A.2d [55,] 58 [(Pa. Super.

*supra* (while parental progress toward completion of permanency plan is important factor, it is not to be elevated to determinative status, to exclusion of all other factors). Paternal grandmother was willing and able to provide kinship care for N.M. E.M. had thrived in paternal grandmother's care upon his initial placement. At the May 2017 permanency hearing, a DHS social worker testified that she would explore paternal grandmother as a willing, approved kinship provider. To deny kinship care based on the unsupported speculation that Parents would abuse visitation rights and visit paternal grandmother's home without agency supervision is overreaching. The Juvenile Act provides for the protection of children under these exact circumstances. *See* 42 Pa.C.S.A. 6351(a)(2)(iii) (disposition of dependent child allows court to "permit the child to remain with . . . guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.").

_____

1991)]. However, the Juvenile Act does not require proof that a parent has committed or condoned abuse before a child can be found dependent. Rather, dependency as defined in the Act exists where a child is without proper parental care, defined as "care or control necessary for his physical, mental, or emotional health or morals." 42 Pa.C.S. § 6302. Thus the Juvenile Act permits a finding of dependency if clear and convincing evidence establishes that a child is lacking the particular type of care necessary to meet his or her individual special needs.

*Id.* at 1317-18.

In fact, it is exactly this unwarranted and continued assumption that has kept N.M. in protracted foster care, especially where the court found that Parents had fully complied with their service plan objectives, which included behavioral health evaluations, completion of parenting classes, attending individual therapy and parenting capacity evaluations. *See* N.T. Permanency Review Hearing, 12/8/16, at 16 ("I'll find that parents are fully compliant."). Tellingly, the court's refusal to provide kinship care or reunify N.M. with Parents has provided the evidentiary platform to support DHS' termination petition. In essence, this is an example of judicially-created parental alienation.

We remind the court that "the primary purpose of the Juvenile Act is 'to preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this chapter.'" 42 Pa.C.S.A. § 6301(b)(1). Moreover, the foregoing goals are to be achieved "in a family environment whenever possible, separating the child from parents **only when necessary for his welfare or in the interests of public safety**." 42 Pa.C.S.A. § 6301(b)(3) (emphasis added). Any decision to remove the child from his home must be reconciled with the paramount purpose of preserving the unity of the family. *In Re Angry*, 522 A.2d 73, 75 (Pa. Super. 1987) (citations omitted). Involuntary termination of parental rights presupposes a finding by the juvenile court that the child is dependent and that, in the best interest of the

child and by reasons of "clear necessity," removal from the parental home is required. *Id.* at 75.

Here, the trial court's repeated refusal to consider approved kinship care, in light of the fact that it also found Parents fully compliant with their treatment goals as of December 2017 and where DHS supported kinship placement with paternal grandmother, is an abuse of discretion and not supported by the record. The court's decision runs counter to the primary purpose of the Juvenile Act, to preserve the family unit. Even if the court specifically found that returning N.M. to her Parents was not best suited to her safety and protection, the court was obligated to explore the possibility of her placement with "a fit and willing relative." *See id.* 42 Pa.C.S. § 6351(f.1)(4). Accordingly, we are constrained to reverse the court's December 8, 2016 permanency orders, which are not supported by clear and convincing evidence.[28]

---

[28] Moreover, the court's refusal to accept any medical testimony to explain N.M.'s injuries, despite asking for same at several hearings, created an insurmountable barrier to their reunification with N.M.

Having determined that the court's permanency order must be reversed, we must also vacate the trial court's decrees that prematurely changed the goal from reunification to adoption and terminated[29] Parents' rights to N.M.[30]

_____

[29] We note that even had we affirmed the permanency orders, we still would have vacated the trial court's termination orders. In her Rule 1925(a) termination opinion, Judge Younge noted that a social worker testified that "there is a deficiency in the protective capacities of Mother and Father because they perceive each other in the family unit as safe and not responsible for N.[]M[.]'s injuries [and that they] continue to reside with each other as indicated perpetrators." Trial Court Opinion, 2/9/18, at 7. Moreover, the court relied upon testimony that the safety threat to N.M. continued to exist at the time of the termination hearing, based upon the fact that the injuries to N.M. were still unexplained. Finally, the court based its termination decision in large part on the fact that Parents were not fully compliant with their objectives "due to failure to address the mental health therapy order by the Court from the inception of the case." *Id.* at 8, *citing* N.T. Termination Hearing, 10/26/17, at 276. To support the goal change to adoption, the trial judge "reasoned . . . Mother and Father failed to present any solid evidence as to progress made in their therapy[,] did not offer treatment plans, nor progress reports or therapist testimony at the [termination] hearing[,] and failed to provide assurances of a level of safety or permanency plan for N.[]M. in fifteen (15) months." Trial Court Opinion, 2/9/18, at 9. We are not convinced that the record clearly and convincingly supports these findings. *See In re Matsock*, 611 A.2d 737 (Pa. Super. 1992) (where no sexual abuse charges had been filed against father nor had he been prosecuted for alleged offense, our Court reversed termination decree where evidence showed father fulfilled affirmative duty to work toward children returning home, even where father "refused to admit his predetermined guilt [which the trial court found] negated his ability to be 'cured'.").

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a
> court "shall give primary consideration to the developmental,

physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). *In In re E.M.*, 620 A.2d 481, 485 (Pa. 1993), this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M*., 71 A.3d 251, 267 (Pa. 2013). With regard to termination under section 2511(b), the court found:

Testimony of [a] social worker was that N.[]M. has a parent-child bond with her pre-adoptive foster parent. [A s]ocial worker testified N.[]M. has [a] good relationship with her foster mother [and] looks to her to meet her day[-]to[-]day[-]needs. N.[]M. has developed a bond with her foster mother in the twenty (20) months she has resided in the home. Furthermore, [a] social worker stated if N.[]M. w[ere] removed from her current foster home there would be a harmful emotional impact on N.[]M. The social worker testified N.[]M. could not be safely reunified with parents because a safety threat of the unexplained injury still exists. The social worker testified there were no safety concerns for N.[]M. in the foster home. Furthermore, the social worker testified N.[]M. had not experienced any significant injuries since entering foster care.

Trial Court Opinion, 2/9/18, at 9 (citations to record omitted).

While courts shall also consider whether children are in a pre-adoptive home and are bonded with their foster parents, *In re: T.S.M.* at 269, here, the court made absolutely no mention of the parent-child bond – the foundation of a needs and welfare analysis under section 2511(b).

At the termination hearing, an agency worker testified that N.M. would "light up" when she visited with Parents. N.T. Termination/Goal Change Hearing, 10/26/17, at 1-3 (237). Father testified that he and Mother have positive

_____

parental bonds with N.M., that N.M. gets very excited and "bangs on the glass" when she comes to the agency for visits, that she calls them "mommy and daddy," and that she runs to them when she sees them at visits. Finally, Father testified that a strong sibling bond exists between N.M. and E.M. Accepting this uncontroverted testimony, we would find that the trial court abused its discretion in terminating Parents' parental rights under section 2511(b), where the evidence does not clearly and convincingly discern the effect on the child of permanently severing the parental bond. *In re: T.S.M.*, *supra*.

[30] We find ourselves constrained to comment as follows: despite record evidence that the trial court allegedly relied upon, the one factor, the elephant in the room, is that the trial judge was and remains the cause of the deteriorated bond between Parents and N.M. in this matter.

The record is replete with attempts by Parents to meet the goals set by the trial judge, however she continued to put up barriers to reunification. As an example, the trial judge stated at the December 8, 2016 hearing that she wanted some testimony as to how the injuries happened. However, at every hearing from March 2017 onward, she refused to allow such testimony, stating that the failure of Parents to appeal her earlier decision with regard to the etiology of N.M.'s injuries was final and could no longer be addressed. When the agency stated that Parents had complied with their goals, the court said, "I'll find that [P]arents are compliant. It doesn't move the needle for me." She further stated that "I guess the other side of the conversation is if I leave her [in foster care] maybe I get closer to an answer as to what happened instead of moving her to grandmom. . . . So, I'm not going to consider kinship care." When the agency determined that kinship placement was available and appropriate, the trial court ruled in May of 2017 that grandparent visitation with N.M. is immediately suspended; it is not in N.M's continued best interests to explore placement in kinship care. In short, despite the goals of the Child Protective Services Law, the trial judge seems to have done everything in her power to alienate these parents from their child, appears to have a fixed idea about this matter and, further, she prohibited evidence to be introduced that might have forced her to change her opinion.

While this court must take and does take the issue of abuse of a child very seriously, the fact that a trial judge tells parents that unless one of them "cops

J-A01011-18
J-A01012-18
J-A01046-18
J-A01047-18


Permanency orders reversed. Goal change/Termination decrees vacated. Jurisdiction relinquished.[31]

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/4/18

------------------------------------------------

to an admission of what happened to the child" they are going to lose their child, flies in the face of not only the CPSL, but of the entire body of case law with regard to best interests of the child and family reunification. We find that the record herein provides example after example of overreaching, failing to be fair and impartial, evidence of a fixed presumptive idea of what took place, and a failure to provide due process to the two parents involved. Finally, the most egregious failure in this matter is the refusal to allow kinship care, despite the paternal grandmother being an available and approved source for same. The punishment effectuated by the trial judge was, at best, neglectful and, at worst, designed to affect the bond between Parents and N.M. so that termination would be the natural outcome of the proceedings. This is an extremely harsh penalty for parents who have complied in every way with the requirements of the CPSL.

[31] We recognize that the Supreme Court has admonished our Court when we have *sua sponte* directed that a different trial judge take over a case on remand. **See Reilly by Reilly v. SEPTA**, 489 A.2d 1291 (Pa. 1985). However, in light of the strong case Parents have made for recusal, the sensitive nature of this case and the seeming confusion that the court has with regard to certain issues (aggravated circumstances finding), we strongly suggest if another petition for recusal is filed below, that the trial judge give serious consideration as to whether her apparent bias warrants that she recuse herself.

- 35 -

J-A01011-18
J-A01012-18
J-A01046-18
J-A01047-18