J-S15045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: N.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: L.A. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2693 EDA 2023 |

Appeal from the Order Entered September 22, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000565-2019

| IN THE INTEREST OF: A.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: L.A. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2694 EDA 2023 |

Appeal from the Order Entered September 22, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000566-2019

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED JUNE 26, 2024**

In these consolidated appeals,[1] L.A. appeals from the trial court orders removing minors N.A. and A.A. (collectively, "Children") from her home, who were born in 2012 and 2010, respectively. Following careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** Pa.R.A.P. 513.

As background, the Children were adjudicated dependent in 2019 and committed to the Department of Human Services ("DHS") that same year. Thereafter, A.A. was placed with L.A., while N.A. was placed in foster care, receiving a subsequent placement at L.A.'s home in 2022.

In 2023, the lower court involuntarily terminated the parental rights of Children's biological mother. Simultaneously, the court granted status, as the kinship parent, to L.A., who is the mother of Children's deceased biological father. The court further indicated that Children were to remain with L.A.

> On June 30, 2023, the [Community Umbrella Agency] [(")]CUA[(")] case manager assigned to the case contacted [L.A.] to set up a home visit. [L.A.] informed the case manager that she had been hospitalized since June 26, 2023, and that [C]hildren had been staying with her daughter. The CUA case manager determined that [L.A.'s] daughter was not an appropriate placement resource for [C]hildren as she was residing in a drug and alcohol recovery house and had dependency and custody matters with her own three biological children. On July 3, 2023, [Children] were placed in a respite foster home certified by Delta Supports.
>
> On September 11, 2023, DHS filed a [m]otion for [j]udicial [r]emoval of [Children] from the home and care of [L.A.]. The [m]otion alleged the basis for removal was the deplorable conditions of [L.A.'s] home, which included severe hoarding and [an] infestation of bugs. Additionally, the [m]otion alleged concerns over [L.A.'s] mental condition and her ability to care for [C]hildren.
>
> [Following a hearing,] the [c]ourt found that it was in the best interest of [C]hildren to be removed from the home and care of [L.A.]

Trial Court Opinion, 12/11/23, at 2 (citation omitted).

L.A. filed timely notices of appeal and, too, timely complied with her

Pennsylvania Rule of Appellate Procedure 1925 obligations. On appeal, L.A. presents one question:

> 1. Did the trial court err and/or abuse its discretion in finding that it was in the Children's best interests to be removed from the home and care of L.A.?

*See* Appellant's Brief, at 5.

This Court's scope and standard of review in dependency cases is as follows:

> We must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In the Interest of A.N.*, 39 A.3d 326, 330 (Pa. Super. 2012) (quoting *In re C.M.T.*, 861 A.2d 348, 351 (Pa. Super. 2004) (citations omitted)).

After a child has been adjudicated dependent, the court may determine a child's temporary or permanent legal custody status, predicated on a finding "best suited to the safety, protection and physical, mental, and moral welfare of the child[.]" 42 Pa.C.S. § 6351(a); *see also In re Lowry*, 484 A.2d 383, 385 (Pa. 1984) (stressing that this statutory clause provides the court's *only* limiting factor in this domain, thereby allowing the court to have broad

discretion). Here, based upon the placement of two dependent children at a foster/kinship parent's residence, "the issue of custody and continuation of foster care are determined according to [the children's] best interest[s]." ***In the Interest of N.M.***, 186 A.3d 998, 1001 n.9 (Pa. Super. 2018) (citation omitted).

In summary, L.A.'s argument is that removal was unwarranted because "she was able to meet all [of] [C]hildren's needs and had moved to correct the issue with her housing." Appellant's Brief, at 9.[2] Although she had been providing "appropriate kinship care for the [C]hildren" for two and four years, respectively, it was only after she went to the hospital for an emergency that triggered removal proceedings against her. ***Id***., at 10. While L.A. acknowledges that her house "was cluttered and dirty," it still featured a usable kitchen. ***Id***. Moreover, she indicates that she "was going to have improvements made to the house[,] but there was a setback when the pastor of [her] church, who was f[u]nding the project, had a heart attack." ***Id.*** L.A. also highlights that "[t]here was no testimony about how long the house was cluttered[,] and there was testimony that the house was ultimately cleaned

---

[2] L.A. repeatedly refers to herself as a "prospective adoptive parent." Appellant's Brief, at 9; ***see also In the Interest of M.R.F., III***, 182 A.3d 1050, 1056 (Pa. Super. 2018) (establishing that "prospective adoptive parents have standing to contest the child welfare agency's decision to remove a child it placed with them in anticipation for adoption[]") (citations omitted). For reasons more fully described later on, DHS indicated that L.A.'s family profile was in non-approval status as it related to the adoption of Children.

up." *Id.* Finally, L.A. avers that "there was no mental health reason that she could not care for the children" and notes her own testimony wherein she stated that "she had a lease for a new apartment that she would be renting shortly[,] which was across the street from [C]hildren's school." *Id*., at 11. [3]

At the removal hearing, the court, *inter alia*, heard testimony from CUA case manager Eileen Groark as well as DHS social work supervisor Amy Flight. The court found both to be credible. *See* Trial Court Opinion, 12/11/23, at 8.

Groark testified that she had serviced Children, and by extension L.A., while they resided in L.A.'s home. *See* N.T., 9/22/23, at 13, 16 (Groark had worked with the three of them "[a]bout a year and a half[]"). On June 30, 2023, Groark contacted L.A. by telephone and was informed that she had entered the hospital on June 26, 2023. *See id*., at 14. L.A. notified Groark that, while L.A. had been in the hospital, Children had been staying with L.A.'s daughter in "a recovery community[]" run by a pastor. *Id*., at 14-15. It was also learned that L.A.'s daughter had her own "open dependency matter in another state" and "did not have custody of her own biological children[.]" *Id*., at 15. Based on these findings, Groark proceeded to "make alternative arrangements for … [C]hildren's placement." *Id*.

Having, on a number of occasions, visually observed L.A.'s residence,

_____

[3] We note that L.A.'s argument section only provides authority discussing the issue of standing. There is no authority in support of her assertion that the lower court committed an error of law or abused its discretion when it determined that removal was in the Children's best interests.

Groark was concerned about the "organization and cleanliness in the home. Issues with hoarding." *Id*., at 16. Although L.A. had been offered "cleaning services and [a] dumpster[,]" L.A. "had made her own plans and declined the services." *Id*. L.A. did not "avail herself of any of the services offered by CUA[.]" *Id*., at 17. On Groark's last visit to L.A.'s house, August 22, 2023, the home "was in substantially the same condition that it had been … for the last year[.]" *Id*. Furthermore, beyond the general lack of organization and cleanliness, L.A.'s house featured "a bug infestation problem." *Id*., at 18. Boxes and items were piled up on all surfaces, and the existence of bugs was noticed "on the furniture, walls, curtains, [and] ceilings[.]" *Id*. Groark believed the bugs to be "water bugs, roaches." *Id*. Describing her walkthrough of the home:

> When you walk into the home you step up. There is a garden. There is a lot of gardening supplies, potted plants, and various equipment out front that you have to kind of step over and navigate.
>
> When you walk in the door it's bare hardwood floor. There are boxes and items stored on every surface up to the ceiling. In the living room there is trash and food mixed in with those boxed items.
>
> … [F]requently boxed items coming in from Amazon to the house. Mostly likely for projects, as the caregiver would say, for the garden and that sort of thing. But there was so much coming in, nothing going out.
>
> And it was a tremendous, tremendously cluttered, difficult to navigate home. In the living room, in the dining room, and then in the back kitchen; there was [a] non-working oven, holes in the wall, refrigerator open.

Bugs dropping out when you open the – that is roaches, when you open the refrigerator door. Food, boxes, supplies all mixed in together. That was – no flooring on the kitchen.

Just bare wood floor. The backyard was full of debris. Downstairs was a finished basement. It was not navigable. Could not really get downstairs.

*Id*., at 18-19.

Groark also testified that "[t]here was a piece of the ceiling that had been falling down." *Id*., at 20. Continuing in her description:

Broken furniture with everything stored in there. Then there was a garage that was chock full with boxes to the ceiling, floor to ceiling.

Heading upstairs, there was a – one of those moving chairs for the elderly and for access between the up and downstairs. The back bedroom included two bunkbeds, two bureaus. And that's where the children slept.

*Id*., at 20. The bathroom had broken fixtures; the toilet had been leaking at times. *See id*., at 21.

Repeatedly, Groark emphasized that the house "was dirty. There [was] … food mixed in with furniture, supplies, clothing bags of clothing. And it was difficult to navigate." *Id*. The Children's beds did not have bedding on them. *See id*., at 22. The "[m]attresses appeared dirty." *Id*. And, paralleling the conditions she witnessed in other rooms, Groark mentioned that "[t]he floor was dirty. Clothes thrown throughout. And the rug in the hallway was in poor shape and very dirty." *Id*.

Groark revealed that L.A.'s house had been sold, with closing taking place in October 2023, so notwithstanding any order of court, the Children

could no longer reside there past that date. **See id**., at 24.[4]

Groark noted her belief that L.A. had mental health concerns, largely due to her hoarding tendencies, and thought some sort of medical assessment would be helpful. **See id**., at 24-25. Groark also stated that there were times when it was "very difficult to understand her." **Id**., at 25. Based on the amount of slurring and unintelligible nature of some of their conversations, Groark speculated that "substance abuse" could be at play. **Id**.

Flight conveyed, based upon her own observations during a separate investigation, that L.A.'s home "was very cluttered. There was lots of clothing, lots of trash. There was no furniture in the living room. In the bedrooms, it was hard to walk into them, because there was clothing within the doorways that made it difficult to actually walk into the bedrooms." **Id**., at 75-76. Flight's photographs, taken contemporaneous with her observations, were admitted into evidence. **See id**., at 74. Flight was unequivocal when she stated that she did not believe the home was in a habitable condition for children. **See id**., at 76.

While the Children's goal had been adoption by L.A., the family profile had been placed in "non-approval status" by DHS largely due to the unsafe conditions of L.A.'s home. **Id**., at 26, 79-82.

_____

[4] L.A. relayed to Groark that, as of the date of the hearing, she had been residing at an Airbnb rental, but did not indicate a more permanent plan once her time at the Airbnb property commenced. **See** N.T., 9/22/23, at 57.

The Children's current foster parent testified that she initially had concerns with the Children's life skills and development. *See id*., at 85. Specifically, N.A. could not tie his shoes and would continue to wear the same clothes after a shower as he had been wearing before, both Children were disinterested in bathing or brushing their teeth, and both Children would utilize the floor for their trash. *See id*., at 85-87. However, this foster parent has been working with the Children to correct their behaviors. *See id*., at 87.

Although L.A. also testified at the hearing, the court found her to be not credible: "[s]he took no accountability for anything and basically testified about the inaccuracies in all of the other witnesses' testimony." Trial Court Opinion, 12/11/23, at 8; *see also* N.T., 9/22/23, at 95. As to where she would be living after her stay at a short-term rental, she indicated that she signed a one-year lease for a two-bedroom apartment, signed in both her and her aunt's name. *See* N.T., 9/22/23, at 107-08.

In finding Groark and Flight to be credible, the court highlighted the repeated attempts that were made to have L.A. correct the problems with her home. *See* Trial Court Opinion, 12/11/23, at 8. However, "the home was in substantially the same condition as it had been for the past year." *Id*. Based on the described conditions, the home "would not be suitable for [Children]." *Id*. Specific to Flight's testimony, she had been to L.A.'s home "ten days prior to the [c]ourt hearing[.]" *Id*. The photographs that were admitted "corroborated her testimony and spoke volumes about the condition of the

home." *Id*., at 8-9.

In conjunction with the home's condition, notwithstanding the ambiguity of L.A.'s future living arrangements, the court was also "concerned about [L.A.'s] mental capacity to properly parent and care for [Children]." *Id*., at 9. Accordingly, the court found it would not be in Children's "best interests" to remain with L.A., as it would be "contrary to their welfare, safety, and health." *Id*.

We discern no abuse of discretion by the lower court in finding that it was in Children's best interests to be removed from L.A.'s care and home. To the extent L.A. complains that there was no testimony establishing how long the home had been cluttered, a condition she admits, Groark expressly testified that she had ongoing concerns during her entire year-and-a-half involvement with L.A., Children, and the home, with nothing assuaging or diminishing Groark's concerns in that time. Moreover, L.A. had been offered both cleaning services and a dumpster to ameliorate the home's dirty conditions on several occasions prior to Children's removal, but she did not accept such offers. As such, based on the particularity of both Groark and Flight's testimony, there was ample record evidence for the court to conclude that the home yielded detrimental conditions for Children and that it would be in their best interests to stop living there. Additionally, we emphasize that L.A.'s future living conditions remained in flux. Even accepting her testimony at face value, the exact dimensions of her two-bedroom apartment remain

unclear, especially if it were to be utilized by, at a minimum, four people.[5] Finally, Children's current foster parent's testimony provides insight into the Children's abilities and life skills prior to their arrival, suggesting that under L.A.'s care, Children were not obtaining adequate life skills and hygiene guidance.

As the court did not abuse its discretion in determining that removal best suited the Children's physical, mental, and moral welfare, we affirm the orders removing them from L.A.'s home.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/26/2024

---

[5] Based on her testimony, it appears that L.A. and her aunt would be residing together at the apartment for at least some period of time. **See** N.T., 9/22/23, at 107.

- 11 -