J-A08030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.N.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.M.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3164 EDA 2019 |

Appeal from the Order Entered October 8, 2019,
in the Court of Common Pleas of Montgomery County,
Orphans' Court at No(s):  No. 2019-A0011.

BEFORE:  LAZARUS, J., KUNSELMAN, J., and McCAFFERY, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED SEPTEMBER 11, 2020**

In this matter, Appellant J.M.C. (Father) appeals the order involuntarily terminating his rights to 3-year-old daughter J.N.C. (Child), pursuant to the Adoption Act.[1] **See** 23 Pa.C.S.A. § 2511(a)(2), (8) and (b).  After careful review, we affirm.

The relevant factual and procedural history is as follows: The family came to the attention of the Montgomery County Office of Children and Youth (OCY) around March 2016 due to concerns about Mother's mental health and substance abuse.  In May 2016, Mother suffered a psychotic episode and was involuntarily committed; at the time of her commitment, Father was incarcerated on a parole violation.

_____

[1] The orphans' court also terminated the rights of S.D. (Mother), who did not appeal.

In June 2016, the court adjudicated Child dependent. Initially, OCY and the court pursued kindship care. Maternal great-grandparents were considered a resource, but the maternal great-grandmother notified OCY that their age and health prohibited them from caring for the infant Child. Father sought to advance a kinship placement with the paternal aunt, however, this was not an option because the paternal aunt lived in Georgia. Moreover, Father could not be a placement resource. Father lived with paternal grandmother, paternal-stepfather, and paternal uncle in a two-bedroom home. The paternal grandparents each occupied a bedroom; the uncle lived in the basement; and Father slept on the couch. Father also suffered from physical and mental health ailments, most of which stem from a traumatic brain injury he received in a car accident when he was 17. Thus, the court placed Child in foster care.

OCY instituted a family service plan to aid in the reunification of the family. Father's goals were: 1) to maintain a safe living environment; 2) address mental health needs; 3) maintain positive coping skills; 4) demonstrate positive parenting skills; 5) address developmental delays; 6) meet basic needs; 7) be a law-abiding citizen; and 8) meet financial needs for daily living.

By the April 2017 permanency review hearing, the court determined Father made substantial progress toward alleviating the circumstances that led to Child's placement. He complied with his probation officer; he completed

parenting classes; attended anger-management-focused therapy; and visited Child regularly. However, he had be unable to achieve stable housing.

From there, Father's progress plateaued. In December 2017, the court determined that Father had not completed a neurological examination, nor had he provided documentation of doctor appointments. The court found further that Father drank heavily and attended Mother's unsupervised visits with Child even though he had been instructed not to; this was a concern because the court found there were multiple domestic disputes between the parents. Father had not attended Child's medical appointments, and he had not taken drug and alcohol screens. Father still had not achieved stable housing.

During the ensuing permanency hearings, the court determined Father's compliance was either moderate or minimal. Tensions also arose between Father and the foster family. While Father would comply with some OCY directives, including visitation, he made no progress toward achieving either housing or financial stability. Thus, Child was still in need of her foster care placement. On January 30, 2019, OCY filed a petition to terminate Father's rights. In February 2019, Father requested that the paternal aunt be considered an adoption resource, which the court denied. According to Father, the aunt was never considered because she lived in Georgia. Tragically, on May 20, 2019, Mother overdosed. Although she survived, she suffered catastrophic brain damage.

The court held the termination hearing over the course of two dates: October 1 and October 4, 2019. Child was appointed counsel, Attorney Craig Bluestein, pursuant to 23 Pa.C.S.A. § 2313(a). Attorney Bluestein represented Child's interests alone during the first day of the hearing. However, on the second day of the hearing, Attorney Bluestein appeared with co-counsel Attorney Laura Kash, who was Child's guardian *ad litem* (GAL) during the underlying dependency case. Attorneys Bluestein and Kash averred to the orphans' court that Child, though only three years old, was able to verbalize that her preferred outcome was to stay with the foster family. Thus, the attorneys submitted that simultaneous representation of Child's best interests and legal interests was permissible under Section 2313(a), and the orphans' court agreed. The court determined OCY met its burden and terminated Father's rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8) and (b). Father presents this timely-filed appeal.

In the Statement of Questions Involved section of his Brief, Father lists 10 issues for our review:

1. Whether the court committed an error of law, or an abuse of discretion, in refusing to permit [Father] to inquire of [Child's GAL] about the circumstances of her October 3, 2019, interview of [Child], regarding [Child's] preferred outcome, after [Father] raised the issue of the foster-parents' bias?

2. Whether the court committed an error of law, or an abuse of discretion, in refusing to permit [father] to testify to the foster parents' lack of contact with him, after [Father] raised the issue of the foster parents' bias?

3. Whether the court committed an error of law, or an abuse of discretion, in refusing to consider the bias of the foster parents' and their recitation of events, baseless accusations against [Father], and continuing disparaging remarks against the abilities of the [Father] to raise [Child]?

4. Whether the court committed an error of law, or an abuse of discretion, by terminating [Father's] parental rights solely on the basis of [Father's] environmental factors, which are beyond his control as a result of a traumatic brain injury in violation of 23 Pa.C.S.A. § 2511(b)?

5. Whether the court committed an error of law, or an abuse of discretion, in refusing to consider [OCY's] failure to pursue [Father's] blood family, as a potential resource?

6. Whether the court committed an error of law, or an abuse of discretion, in refusing to consider [OCY's] failure to pursue [Father's] family as a concurrent option to reunification with [Mother]?

7. Whether the court committed an error of law, or an abuse of discretion, in refusing to consider [Father's] family as a resource after the change in circumstance caused by [Mother's] overdose?

8. Whether the court committed an error of law, or an abuse of discretion, in [OCY's] refusal to consider [Father] as a reunification resource, despite [Mother's] ongoing police contact, failure to address mental health concerns, and continued substance abuse issues?

9. Whether the court committed an error of law, or an abuse of discretion, in refusing to consider how OCY's continued pursuance of [Mother] as the reunification resource despite [Mother's] ongoing police contact, failure to address mental health concerns, and continued substance abuse issues, lengthened [Child's] time in foster care?

10. Whether the court committed an error of law, or an abuse of discretion, by not requiring [Child's GAL] to

> provide information sufficient for the court to believe that [Child] understood the purpose and impact of [Child's] statements?

Father's Brief at 4-7.

To begin our discussion, we must first address which issues Father has preserved for our review. We observe Father voluntarily withdrew his second, third, and seventh issues. Even though he listed these issues in his Statement of Questions Involved section of his Brief, Father indicated in the Argument section that he would not pursue them. However, there are other issues where we must find waiver.

Father filed one notice of appeal from one docket – the orphans' court termination docket;[2] he did not appeal from the juvenile court order on the dependency docket. This is problematic, because several of Father's appellate issues involve juvenile court determinations made during Child's dependency case. Specifically, whether the OCY employed sufficient reunification efforts and whether juvenile court should have placed Child in kinship care (*i.e.*, with Father's family) were questions that the juvenile court had to determine during the dependency case. These were not decisions the orphans' court could make during the termination hearing. *See In re B.L.W.*, 843 A.2d 380, 384 n.1 (Pa. Super. 2004) (*en banc*) (Holding that the focus of a termination proceeding is on the parents' conduct, and the adequacy of the agency's reunification efforts is not a valid consideration.) Notably, the juvenile court's

---

[2] Typically, this docket is referred to as the adoption docket.

denial of Father's request for kinship care was **not** a final, appealable order **until** the orphans' court made its termination decision. **See In Interest of N.M.**, 186 A.3d 998, 1008 (Pa. Super. 2018). In that sense, Father's present appeal of these specific dependency issues would have been timely. However, in order for these dependency issues to be properly before us, Father would have had to have filed a separate notice of appeal from the dependency docket. **See** Pa.R.A.P. 341(a); **see also Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) ("[T]he proper practice under [Pa.R.A.P.] 341(a) is to file separate appeals from an order that resolves issues arising on more than one docket.").

In **In the Interest of K.M.W.**, --- A.3d ---, 2020 PA Super 200, (Pa. Super. August 18, 2020), an *en banc* panel of this Court overlooked the bright-line rule in **Walker** when a parent filed only one notice of appeal, **but listed both** the dependency and termination docket numbers. Notwithstanding the fact that the parent filed one notice of appeal from two dockets, we considered the merits of both appeals. Here, however, we decline to extend this exception to situations like this, where the parent only appealed from the termination docket. A parent cannot raise dependency issues in a termination appeal when no appeal from the dependency case was taken. **See K.M.W.**, 2020 PA Super 200, at \*6 (citing **Commonwealth v. Johnson**, --- A.3d --, (Pa. Super. 2020) (*en banc*) (holding that the bright-line rule in **Walker** requires an appellant to file a separate notice of appeal for each lower court docket the appellant is challenging)). Because Father did not appeal the

dependency order, we have no jurisdiction to address any of his dependency issues, including whether the juvenile court erred in denying Father's request for kinship placement during the dependency case.[3] As such, Father's fifth, sixth, eighth, and ninth issues are waived.

Unfortunately, our waiver analysis does not end there. Father's first and tenth issues both concern the court's decision to allow simultaneous representation of Child's best interests and legal interests.[4] ***See generally*** Father's Brief at 27-36, 59-61.

_____

[3] We note, however, that the goal throughout the dependency case was reunification with both parents, even if there was a concurrent goal of adoption. Placing Child with Father's relative in Georgia would have severely impacted OCY's ability to reunify Child with Mother, let alone Father. Reunification with Mother was an entirely valid objective, given the fact that she did not suffer her debilitating brain injury until the 11th hour of the dependency case, and by that time, Child had resided with the foster family for nearly three years – virtually her entire life. ***See generally*** Trial Court Opinion (T.C.O.), 11/26/19, at 5-6.

[4] Section 2313(a) of the Adoption Act requires the orphans' court to appoint an attorney to represent the child in cases concerning the involuntary termination of parental rights. ***See*** 23 Pa.C.S.A. § 2313(a). In ***In re Adoption of L.B.M.***, 161 A.3d 172, 180 (Pa. 2017), our Supreme Court interpreted Section 2313(a) to mean that the child's attorney had to represent the child's ***legal*** interests, *i.e.*, the child's preferred outcome. The High Court further held that if the child had been appointed a guardian *ad litem* (GAL) – typically, a holdover from the underlying dependency case – the GAL may not simultaneously represent the child's legal interests and best interests if those interests conflict.

On the second day of the termination hearing, Attorney Kash appeared with Attorney Bluestein.[5]  Attorney Kash explained to the court that she was able to discern that the three-year-old Child's preferred outcome, *i.e.* Child's legal interests, was to stay with the foster family.  Attorney Kash then detailed her meeting with Child.  Initially, Child indicated that she did not want "this home to be her forever home." **See** N.T., 10/3/19 (Day 2), at 8.  Attorney Kash explained that after more follow-up questions, she understood that Child was confused.  The foster family had told Child they might move.  Therefore, Child took the "forever home" question literally; Child did not wish to reside in the house without her foster family, but rather she wished to reside with the foster family in the new house. *Id.*  Attorney Kash also inquired about a picture Child made for a pre-school project.  The project instructed Child bring a picture of her home and family; Child identified the foster home as her family. *Id.* at 10.  Attorney Kash asked if Child wished to have continuing contact with either of her birth parents.  Child wished to see her Mother when she got better – an impossibility, given Mother's grievous injury – but Child stated she did not enjoy visits with Father.  *Id.* at 12.  Child explained that

_____

[5] Apparently, Attorney Bluestein represented Child by himself during the first day of the hearing, because until Attorney Kash met with Child between the first and second court date, it seemed Child was too young to verbalize a preferred outcome.  In such cases, the Child's counsel could proceed to represent Child's best interests under Section 2313(a). **See In re T.S.**, 192 A.3d 1080, 1090 (Pa. 2018).  But on October 3, 2019, Attorney Kash met with Child, who presented herself more clearly since starting pre-school.  After concluding that Child had a stated preference, Attorney Kash appeared with Attorney Bluestein on the second day of the termination hearing to convey this preference to the court.

Father was "annoying" and that he yells. Upon the court's probing, Attorney Kash represented that, while Child is too young to appreciate the legal terminology, Child was still able to give a clear direction about her desired outcome: termination. *Id.* at 11.

At this point, the court permitted Father's counsel to ask follow-up questions. Father asked where the meeting between Child and Attorney Kash took place and who was present. When those questions were answered, Father's counsel asked how long the visit took, at which time Attorney Bluestein objected on the grounds that Father's inquiry was running afoul of the attorney-client privilege. *See id.* at 13-14. Attorney Bluestein presented case law, and court then held a brief discussion about the propriety of Father's inquiry. Father's counsel explained that the purpose of the inquiry was less about the conversation Child had with Attorney Kash, and more about the effect the foster family had on Child while the conversation took place. *See id.* at 15. In any event, Father's counsel stated that she would need time to review those cases.

Critically, the court did not rule on Attorney Bluestein's objection. The court stated it shared Attorney Bluestein's concerns about privilege, but that it also sympathized with Father's argument. Without ruling, the court proposed that the parties revisit the issue after the lunch recess so as to allow Father's counsel time to review the case law. Father's counsel agreed, but as far as we can tell, Father's counsel decided to not raise raised the issue again after recess. Therefore, we must conclude that Father failed to preserve this

issue. *See* Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *see also In re Adoption of K.M.G.*, 219 A.3d 662, 669 (Pa. Super. 2019) (*en banc*) (The Superior Court may not *sua sponte* raise the issue of dual representation where the appellant-mother failed to object.). The orphans' court never made a definitive ruling but allowed Child's co-counsel to proceed with dual representation. Father did not object to the court's procedure, nor did Father attempt to re-examine Attorney Kash further. Instead, Father effectively conceded the point.

Even if we were to consider these issues, we observe they are without merit. Father seems to misconstrue the purpose of Attorney Kash's averments about Child's preference. The purpose of these averments is to ensure that representation is proper under Section 2313(a) – that there is no conflict between what a child wants and what is best for the child. In his Brief, Father doubts whether the three-year-old Child has the word "annoying" in her vocabulary, and he raises the prospect that Child was coached by the foster family. *See* Father's Brief at 33-34. Father submits further that Child's alleged statement that she does not like visits with her Father appears to conflict with other testimony that Child enjoyed visits with Father. *Id.* at 34-35. Likewise, Father states that he wished to investigate Child's purported confusion about the meaning of a "forever home." *Id.* at 61. Perhaps more to the point, Father argues that he could not investigate whether Attorney Kash explained to Child that Child would never see Father again if his rights were terminated. *Id.*

- 11 -

Surely some investigation into a child's preferred outcome is appropriate, especially when the child is on the cusp of "verbalization," as delineated in *In re T.S.*, *supra*. However, Father's inquiry was not aimed at discerning whether there was an actual or potential conflict between Child's best interests and legal interests, and Father did not attempt to disqualify Child's simultaneous representation. *See L.B.M.*, 161 A.3d at 184 ("[T]he propriety of permitting the same individual to serve in both capacities should be determined on a case-by-case basis, subject to the familiar and well-settled conflict of interest analysis.") (Saylor J., concurring). Instead, Father sought to advance the theory that the foster family soured the relationship between Father and Child.

Supposing Child's preferred outcome merely parroted the foster family's preference, we fail to see how the same affects Child's representation. When the child is capable of verbalizing a preferred outcome, Section 2313(a) mandates that a child's counsel represents what the child wishes to happen without regard to why the child desires what they do, or even whether what the child wants is in the child's best interests. Here, Father seems to argue Child's preference should be discounted because she was too young to understand that she would never see Father again, or in the alternative, Child was strong-armed by the foster family. If either of these hypotheticals were true, then Child's position would be unknowable, at which point Child's attorneys would have been free to advocate solely for Child's best interests:

termination. Thus, even if we did not find waiver of Father's first and tenth issues, we would have concluded that these issues lacked merit.

Between those issues Father has waived and those Father has withdrawn, only one issue remains:

> 4. Whether the court committed an error of law, or an abuse of discretion, by terminating [Father's] parental rights solely on the basis of [Father's] environmental factors, which are beyond his control as a result of a traumatic brain injury in violation of 23 Pa.C.S.A. § 2511(b)?

**See** Father's Brief at 5.

We begin our discussion mindful of our well-settled standard of review in termination cases:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

- 13 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

In this case, the court terminated Father's parental rights pursuant to subsections 2511(a)(2), (8), and (b). Father does not challenge the trial court's conclusions that termination was warranted under Section 2511(a), thereby conceding the first prong of the termination analysis. Rather, he focuses his appeal on the second prong under Section 2511(b). This section provides:

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent **shall not be terminated solely on the basis of environmental factors** such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. [....]

23 Pa.C.S.A. § 2511(b) (emphasis added).

In the context of the Section 2511(b) analysis, "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). The court is not required to use expert testimony, and social workers and caseworkers

- 14 -

may offer evaluations as well. ***Id***. Still, the ultimate concern is the needs and welfare of a child.

We have explained:

> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial.

***Matter of M.P.***, 204 A.3d 976, 984 (Pa. Super. 2019) (citing ***Z.P.***, 994 A.2d at 1121). Lastly, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. ***See M.P.***, 204 A.3d at 984 (citing ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011))*.*

Here, Father argues the court erred, because it terminated his rights based on environmental factors. Father suffered a traumatic brain injury, resulting from an automobile accident when he was 17. By Father's own admission, he experiences significant effects from the injury. He has difficulty reading and comprehending. On account of the injury and his bi-polar diagnosis, Father receives a fixed income. He lives with the paternal grandparents and paternal uncle in a two-bedroom home – Father sleeps on the couch. Consequently, the court determined his home to be unsuitable for the Child. ***See*** Father's Brief at 42. Importantly, Father never offered himself

as a placement option. Father reasons that these are environmental factors that should be cast aside.

Father concedes other aspects of the Section 2511(b) analysis favor termination, but Father attributes this to OCY's mismanagement of the dependency case. For instance, Father achieved unsupervised visits only briefly, but the visits were switched back to supervised after Child experienced diaper rash. *See id.* at 43. Father blames the rash on something the foster parents did or did not do. Although the expert evaluator determined that the parental bond between Child and Father was attenuated, Father blames the lack of a bond on OCY. *See id*. at 46-47. He reasons that Child was removed from *Mother*, as a result of *Mother's* behavior. He also contends that his bond was attenuated with Child, because OCY allowed Child to languish in foster care for over 30 months as OCY sought reunification with Mother. According to Father, OCY should have considered the out-of-state placement with paternal aunt. *See id.* at 46-48.

We disagree. First, Father does not benefit from the fact that Mother had to care for Child by herself prior to Child's removal. Even though OCY removed Child from Mother's home, and even though Father was incarcerated at the time, Child was removed from both parent's legal care. Second, we fail to see how a bond between Child and *Father* would have been less attenuated had Mother achieved reunification, or if the court allowed Child to move to Georgia with the paternal aunt. Finally, to Father's primary contention about environmental factors, Father misreads Section 2511(b). A parent's rights

may not be terminated **solely** on the basis of environmental factors. **See** 23 Pa.C.S.A. § 2511(b) (emphasis added). Father's inability to achieve housing and his inability to achieve financial stability beyond his fixed income could be construed as environmental factors. That does not mean they are irrelevant to the termination analysis. But this case is not about environmental factors. Rather, it is about Father's incapacity. Father's limitations simply prevent him from meeting the needs and welfare of Child. Consequently, Child had to spend years in foster care. Termination best serves Child's interests, because the same allows her to achieve permanency with the only caregivers she has essentially ever known. We acknowledge the orphans' court finding that Father loves Child. However, "[a] parent's own feelings of love and affection alone, do not prevent termination of parental rights." **Z.P.**, 994 A.2d at 1121 (citation omitted).

To conclude: Father waived or withdrew all of his appellate issues with the exception of his challenge to the court's determination under Section 2511(b). Upon our review, we conclude the orphans' court did not abuse its discretion or commit an error of law. Father's rights were not terminated based solely on environmental factors. Termination best serves Child's needs and welfare.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/11/20