J-A18044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 480 WDA 2024 |

Appeal from the Order Entered April 1, 2024
In the Court of Common Pleas of Westmoreland County
Juvenile Division at CP-65-DP-0000027-2021

BEFORE:  OLSON, J., MURRAY, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED:  October 8, 2024**

M.B. (Appellant) appeals from the juvenile court's permanency review order which suspended his visitation with his biological daughter, S.S. (Child), and directed that Child "remain in [f]oster [c]are."[1]  Permanency Review Order (Order), 4/1/24, at 2-3.  We affirm.

Child was born in December 2020.  The Westmoreland County Children's Bureau (Agency) obtained emergency protective custody of Child when Child was three months old.  Order for Emergency Protective Custody, 3/30/21, at 1.  Child had been diagnosed with "failure to thrive."  **Id.**  At the time, Appellant was not a party to the case.  Child resided with C.O. (Mother), who

---

[1] The order is appealable under the collateral order doctrine.  **See Int. of R.H.**, --- A.3d ----, 2024 PA Super 161 (filed July 30, 2024) (holding that Superior Court has jurisdiction under the collateral order doctrine when a permanency review order results in complete denial of a parent's visitation).

lacked stable housing, and "stay[ed] between [the homes of] maternal uncle and maternal grandmother." *Id.* On March 30, 2021, the court ordered that Child be placed in foster care. *Id.*

On May 7, 2021, the juvenile court adjudicated Child dependent. In July 2021, when Child was six months old, Appellant was joined as a party to the case after a paternity test established that he is Child's biological father. *See* Appellant's Brief at 5. The court, *inter alia*, ordered that Appellant have supervised visitation with Child. After a review hearing in November 2021, the court found:

> There has been moderate compliance with [Appellant's] permanency plan in that [Appellant] began supervised visits on August 6, 2021 ([attended] six of seven). He has a mental health history, but denies drug and alcohol or domestic violence issues. … [Appellant] does hands-on parenting and curriculum. He was indicated for [committing] abuse three times, all sex abuse when he was 13, so psychosexual evaluation must be done. …

Order, 11/17/21, at 1.

After a review hearing in May 2022, the court determined:

> [Appellant] sometimes fails to follow-up with parenting instruction. [Appellant] did psychosexual assessment and needs treatment. [Appellant] attended 34 of 41 offered visits. He cannot manage his anger, continues to fight/bicker with Mother … despite repeated discussions with [service] providers to avoid this. … [Appellant] needs [to be] prompted to attend to [C]hild's cues and has difficulty de-escalating anger. [C]hild often does not want to go to [Appellant] – she cries. On April 2, 2022, [a] psychiatric evaluation [diagnosed Appellant with] Autism, ADHD [and concluded Appellant] needs therapy.

Order, 5/5/22, at 2.

Appellant had supervised visits with Child for approximately two and a half years. On January 10, 2024, the juvenile court held a review hearing, "and due to the lengthy testimony," the hearing was scheduled for a second day of testimony on March 22, 2024. Juvenile Court Opinion (JCO), 4/29/24, at 1. By order entered April 1, 2024, the juvenile court suspended Appellant's visits. The order states:

> It has been determined that visitation with [Appellant] is contrary to the safety or well-being of Child. Specifically, the therapist[, Margaret Ferguson,] testified that continuing visits with [Appellant] would be harmful to [C]hild. After visits, [C]hild demonstrates self-harming behavior and has nightmares. [C]hild also struggles with sleeping and wetting the bed after visits.

Order at 3. The court noted Ms. Ferguson's "lengthy testimony," that "[m]ore recent visits have presented more concerning behavior" by Child. JCO at 2-3. Specifically, the court "determined through clear and convincing evidence that continuing visits created a grave risk of emotional harm to [C]hild and visits with [Appellant] should be suspended." *Id.* at 4.

Appellant timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i). Appellant presents the following issues for review:

> I. Whether the [juvenile] [c]ourt erred in finding that visits with [Appellant] create a grave risk of emotional harm, and erred in [o]rdering that [Appellant's] visits are suspended?
>
> II. Whether the [juvenile] [c]ourt erred in finding that the Child's placement is the least restrictive placement that meets the needs of the Child, that there is no less restrictive alternative available, and that Paternal Grandmother's Kinship Foster application was properly denied by the Agency?

- 3 -

Appellant's Brief at 4.

In his first issue, Appellant argues the juvenile court erred by suspending his visits with Child because "the evidence relied upon [by] the [c]ourt was provided solely by one witness." *Id.* at 20. The witness was Child's therapist, Ms. Ferguson. Ms. Ferguson testified that Appellant's visits with Child posed a grave threat to Child's "ongoing mental, physical and emotional health." N.T., 1/10/24, at 81. Appellant emphasizes that the Agency did not offer corroborating testimony, and claims Ms. Ferguson's "conclusion that visits with [Appellant] are a grave threat to the Child is based primarily on speculation." Appellant's Brief at 20, 22. Appellant contends the Agency "engaged Ms. Ferguson to make the findings that would justify their approach in this case." *Id.* at 27. He states:

> Ms. Ferguson's testimony about future harm to the Child due to attachment disorder, when there is not even an attachment disorder diagnosis at this point, clearly amounts to mere speculation. No evidence was presented of self-harming behaviors other than hearsay testimony.

*Id.* at 28.

The Agency argues Ms. Ferguson's testimony was sufficient to support the juvenile court's finding that Appellant exhibited "a moral deficiency of egocentric behavior, that in this case, results in grave harm to [C]hild, thus meeting the standard for suspending visits." Agency's Brief at 8.

At the outset, we recognize:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility

- 4 -

determinations of the trial court if they are supported by the record ... but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). The juvenile court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

When the juvenile court issued the order suspending Appellant's visits, Child had concurrent permanency goals of reunification and adoption. Order at 2. When reunification remains a goal, parental visitation may not be denied or reduced unless visitation poses a grave threat to the child. *In re C.J.*, 729 A.2d 89, 95 (Pa. Super. 1999). We have explained:

> The polestar and paramount concern in evaluating parental visitation, in dependency as well as non-dependency situations, is the best interests and welfare of the children. …
>
> However, because of the constitutionally protected liberty interest parents have to such visitation, parental visitation is usually not denied or limited unless visitation with the parent poses a grave threat to the child. …
>
> In dependency cases …, the standard against which visitation is measured also depends upon the goal mandated in the family service plan. Where … reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat.

*Id.* at 94–95 (citations and footnote omitted).

Here, the "grave threat" standard was applicable given Child's concurrent permanency goals of reunification and adoption. This Court has stated:

> The "grave threat" standard is met when the evidence clearly shows that the parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

*In re C.B.*, 861 A.2d 287, 293-94 (Pa. Super 2004) (citations and some quotations omitted).

Ms. Ferguson testified at length, and without objection, "as an expert in the field of trauma therapy and attachment."[2] N.T., 1/10/24, at 28-29. Ms. Ferguson is a licensed therapist who has practiced for 28 years. *Id.* at 27. For the past 18 years, she has specialized in "trauma and attachment work." *Id.* Ms. Ferguson also has prior experience "testif[ying] in courts in Pennsylvania," including Westmoreland County. *Id.*

Ms. Ferguson testified that she provided therapeutic services to Child at the request of the Agency. *Id.* at 29. The therapy occurred from August through December of 2023, when Child was approximately three years old, and included Child's supervised visits with Appellant. *Id.* at 29, 80. Ms. Ferguson described Child as follows:

---

[2] Appellant correctly refers to Ms. Ferguson as an art therapist, but she is also certified in trauma, attachment, and reactive attachment therapy. *See* Appellant's Brief at 6, 8, 23; N.T., 1/10/24, at 25-28.

She was very impulsive. She had difficulty focusing. She was aggressive towards the foster parents and peers at [daycare]. She was oppositional. … She would [have] tantrums that would last a half hour. She would push peers, bite peers, and do those same things at the foster home. It was very hard to get her de-regulated.

*Id.* at 30.

Ms. Ferguson distinguished Child's tantrums for their "duration, frequency, and the extent of them." *Id.* She stated that she observed and worked with Child when Child was at daycare. *Id.* at 31. She explained:

Typically a child her age might [have] a tantrum for two, three minutes. Hers were a half hour. The things that triggered her were constant. …

She was extreme in her behaviors at [daycare] with peers, pulling hair, biting them, pushing them, and it would be consistent throughout the day. It wasn't an episode. It was behavior throughout the day. …

She was quite the challenge at the beginning[,] … she was hoarding all the materials, which is very typical of a child that has suffered neglect. She was excess[ive with her] use of the materials because she was so needy. She refused my help; she was oppositional; she wouldn't share; she wouldn't follow directions; she was demanding, and she didn't have any boundaries with her behavior or her art work.

*Id.* at 31-32. Ms. Ferguson described Child taking crayons and markers and "stick[ing] them in a pocket; she'd stick them in her bag; she'd stick them down her shirt, she just wanted them all." *Id.* at 32.

Ms. Ferguson also testified about Child exhibiting self-harming behavior. Ms. Ferguson explained:

[Child] was very preoccupied with blood. She would self-harm, scratch herself to see the blood. She would bite herself to see the blood. She was very mean to the [foster family] dog[, and h]ad

difficulty being nice to the dog and would harm the dog. She didn't have any remorse or any empathy after these behaviors.

And that was incredibly concerning because when a child does not have a strong attachment, … there is a correlation with behaviors that can occur as an adolescent.

[W]e really start to worry about what that would mean in [Child's] adult life. And the really concerning thing about [Child] was that she was demonstrating some of these conduct disorders as a [toddler], which is very, very, scary.

… [Y]ou get into things like antisocial disorder as an adult. Those are the behaviors she's already demonstrating ….

*Id.* at 33-34.

Notably, Ms. Ferguson testified that she began "doing supervised therapeutic visits" with Child and Appellant, "out of a concern for the behaviors that were occurring at the daycare following visits [with Appellant] and occurring in the foster home following visits [with Appellant]." *Id.* at 34. Ms. Ferguson emphasized "concern about what was going on at the visits that might be triggering [Child's] behaviors." *Id.* Ms. Ferguson "conducted nine therapeutic supervised visits from August 23rd to December 27th." *Id.* at 36. She described her role as a "child-focused" observer. *Id.* at 34-35. However, she would suggest parenting strategies to Appellant if she "became concerned for" Child. *Id.* at 35.

Ms. Ferguson described Appellant as having a "dismissive" and "egocentric … parenting style," focused on "meeting his own needs and wishes, and that is incredibly harmful [to Child]." *Id.* at 37, 40. She stated that Appellant "becomes increasingly frustrated. He gets mad. He really

doesn't want to incorporate [parenting suggestions]. He doesn't like the suggestions, [which] is concerning." *Id.* at 47.

Ms. Ferguson explained that she was "so disturbed" by Appellant "ignoring" Child's feelings "to meet his own needs and wishes." *Id.* at 37. She provided four examples of Child being "frightened" and "stressed" when Appellant (1) "was insistent" that Child sit on Santa's lap; (2) "got very angry" when Child did not want to read a book and Appellant "continued to read it"; (3) "insisted that [Child] sit on his lap … pulled her up, put her on his lap"; and (4) "insisted [Child] give him a hug … after [Child] said three times she didn't want a hug." *Id.* at 37-39. According to Ms. Ferguson, Appellant's actions "reinforce[d] [Child's] fears that her needs aren't met [when] she's made to do things that are against her wishes." *Id.* at 39-40. Ms. Ferguson stated that Appellant "triggers the trauma." *Id.* at 40.

Ms. Ferguson also testified that Appellant "had a difficult time" with community-based visits, such as playgrounds and libraries. *Id.* at 41. She stated that when Appellant and Child were at an indoor playground at Burger King, Appellant had to be "redirected" 17 times, 9 of which "were safety issues." *Id.* at 41; *see also id.* at 81 (Ms. Ferguson, in response to questioning by Appellant's counsel about "very typical" playground behavior, stated that "falling off of something high" is harmful, and "[i]t was [Appellant's] only job[] to watch [Child]").

On another occasion, a visit occurred at a "family fun center," where Appellant "lost [Child] three times because he was preoccupied with playing his own games." *Id.* at 42. Ms. Ferguson added:

[Child] begged to go on the merry-go-round for the whole visit, and she never did get to do that with [Appellant]. And at the end, after playing all these games and losing focus on [Child], when they went to turn in the tickets for the prizes, [Appellant] picked the prizes for [Child] and took them with him.

*Id.* Ms. Ferguson also recounted an "ongoing issue" of Appellant "giving [Child] stuff, claiming to give her stuff, and then taking it away," and Child repeatedly expressing that she did not want to visit Appellant and "wanted to go home" to her foster parents. *Id.* at 43-44.

Ms. Ferguson relayed that she "was very careful to observe [Child] at the daycare" when Child would go to daycare directly after visits with Appellant. *Id.* at 45. She stated that Child exhibited "increased hitting, biting, punching, destroying property, defian[ce], pushing other kids; she won't share; she takes their toys." *Id.* She also testified that "with the exceptions of afternoons following visits [with Appellant], [Child] continued to increase positive behaviors[.]" *Id.*

Ms. Ferguson stated that she "worked very, very closely" with Child and understood her behavior. *Id.* at 46. She testified that during a therapy session on October 3, 2023, Child showed an "indication of attachment" to her foster parents. *Id.* Pertinently, the Agency's counsel asked Ms. Ferguson:

- 10 -

Q.    If [Child is] required or forced to continue … with visits with [Appellant,] … does this pose a grave threat to her ability to proceed with forming attachments[?]

A.    Absolutely.  [If Child] continue[s] to be subject[ed] to these [visits with Appellant], [it] will impair her ability to form healthy attachments.   And then if she does not obtain healthy attachments, she will be impaired socially, physiologically, neurobiologically, which will greatly increase her likelihood to develop psychopathology ….   And again, we see those impairments now.  We see them decreasing where her needs are getting met at the foster home.  We're seeing them decrease at the daycare ….

**Id.** at 47-48.

On cross-examination, Ms. Ferguson was asked how she defines "grave threat, or what is in your determination in the finding of grave threat?"  **Id.** at 65.  She answered:

I don't take it lightly.  I've done a tremendous amount of research on it.  And to be quite honest, a tremendous amount of soul searching, and what does that mean for [Child]?

And … grave threat to me means that it will dramatically impair her … socially, physiologically, and neurobiologically.   Which means, again, the chances for her to have some psychopathology, which is a serious issue that people do not get past[,] … if that were to occur for her, **which it will if we don't address this**, then she will have a lifetime of struggle.

**Id.** (emphasis added).

Ms. Ferguson testified that visitation with Appellant poses a grave threat to Child's "ongoing mental, physical and emotional health."  **Id.** at 81.  Appellant's counsel asked Ms. Ferguson:

Q.    How does the physical health impact that?  Is it just those safety incidents at Burger King?  Is there anything else?  …

A. Okay. So when you understand mental health, when you understand emotional health, as we see with [Child] … physical health [is implicated]. … [Child] harms herself; she physically harms herself. She harms other people. …

As she becomes an adult, that morphs into suicidal ideation. It morphs into harming [herself], self-mutilation. Those are all conduct-disorder-related activity that … correlates … with children who have the inability to form attachments.

*Id.* at 82.

In addition to Ms. Ferguson, the juvenile court heard testimony from Michael Caggeso, who works in the Agency's foster care department; Colleen Flynn, a family support services supervisor at the Children's Institute; Lori Cramer, the Agency's case supervisor; Appellant; and C.B., Appellant's mother. *See, generally*, N.T., 3/22/24, 19-140. Ultimately, the court acted within its discretion in crediting and relying on Ms. Ferguson's testimony in concluding that Appellant posed a grave threat to Child.

This Court "must accept the facts as found by the trial court unless they are not supported by the record." *Int. of L.B.*, 229 A.3d 971, 977 (Pa. Super. 2020). In *L.B.*, the father argued that the juvenile court improperly suspended his visitation with his son. We agreed with the father because "the juvenile court erred by … outsourcing the decision of when those visits may or may not resume to a therapist." *Id.* at 977–78. We remanded the case for the juvenile court to "move with deliberate speed in determining whether [f]ather poses a grave threat to [c]hild." *Id.* at 978.

Here, Ms. Ferguson testified that Appellant "triggers the trauma," and opined that Appellant's visits with Child should be suspended permanently.

- 12 -

N.T., 1/10/24, at 40, 83 (Ms. Ferguson stating, "That is my opinion. … [I]t's not an easy one, but it's the right one."). The juvenile court referenced Ms. Ferguson's testimony, stating:

> [Ms.] Ferguson, [the t]herapist from Nevaeh, has been providing services to [C]hild and has been supervising visits. [C]hild is currently receiving art therapy through this provider as well. [C]hild has extensive emotional and behavioral concerns. [C]hild engages in self-harming behaviors and demonstrates physical aggression towards her peers. The therapist is working with [C]hild to address the behaviors. Ms. Ferguson reports that [Appellant] displays a dismissive parenting style. When [C]hild calls [Appellant] by his first name, [Appellant] corrects [C]hild[,] saying I am "Daddy"[,] and has a tendency to prioritize his wants over that of [C]hild. …
>
> Following visits with [Appellant], [C]hild is dysregulated for days. [C]hild has nightmares, stomach issues, trouble sleeping, and wets the bed. The therapist's professional opinion is that visits should end at this time due to the grave emotional harm being caused to [C]hild. The therapist also reported that [C]hild displays attachment for the foster parents.

Order at 6.[3]

_____

[3] The juvenile court also observed:

> There has been substantial compliance with the permanency plan, in that [Appellant] has attended 24 of the 31 offered visits with [C]hild. [However, Appellant] has not allowed the [A]gency to assess his home. [Appellant's] home might be stable and appropriate but he has prevented [the Agency] from verifying this. … [Appellant] has not undergone an updated psychiatric evaluation. [Appellant] completed the ordered anger management and [Appellant] continues to attend sexual offender's treatment through Yaroch Counseling.

JCO at 2.

- 13 -

The juvenile court did not err in accepting Ms. Ferguson's testimony when it "determined through clear and convincing evidence that continuing visits create[] a grave risk" to Child. JCO at 4. Thus, the court did not abuse its discretion in ordering that Appellant's visits be suspended.

In his second issue, Appellant argues the juvenile court erred by ordering Child's continued placement in foster care, and claims that his mother (Paternal Grandmother) is the least restrictive and proper placement for Child. Appellant asserts that Paternal Grandmother "moved with reasonable speed under the circumstances in completing the [k]inship application." Appellant's Brief at 28. According to Appellant, the Agency's representative, Mr. Caggeso, "established a laid-back pattern" which led Paternal Grandmother to believe "she was moving at a sufficient pace." *Id.* at 28-29. He states that Paternal Grandmother "has completed all parts of the application, other than the clearances required for Paternal Uncle, who lives in her home." *Id.* at 29. Appellant also states that the "only reason [Paternal Uncle's clearances] are not completed is the Paternal Uncle's special needs, being autism and seizure disorders, and recent hospitalization for a toxic reaction to his new anti-seizure drugs." *Id.* at 31. This argument is not persuasive.

As the Agency observes, Paternal Grandmother failed to complete the application. *See* Agency's Brief at 9 (emphasizing Child had been in foster placement "for a significant period of time and permanency was tantamount"). Mr. Caggeso testified to beginning the kinship foster home study for Paternal Grandmother in mid-July 2023. N.T., 1/10/24, at 4-5. He explained there

was no legal deadline for Paternal Grandmother to complete the application. *Id.* at 14. However, he also testified that the Agency "issued a deadline [for Paternal Grandmother] to finish it by mid-December because this case has been going on so long and permanency seems pretty tantamount." *Id.* According to Mr. Caggeso, Paternal Grandmother understood that "time was of the essence." *Id.* at 21-22.

From mid-July through mid-December 2023, Mr. Caggeso completed four home visits and noted an improvement with "a lot of stuff laying around" Paternal Grandmother's home. *Id.* at 10-11. He described the home as not "ideal, but it didn't hit that line of can't place a child there." *Id.* at 11.

At the time of the January 10, 2024 hearing, Paternal Grandmother had not obtained her FBI clearance, and Paternal Uncle, who lives with Paternal Grandmother, had not obtained any clearances. *Id.* at 7, 15 In addition, Paternal Grandmother did not provide proof of home insurance, complete the free online mandatory reporter training, and if Paternal Grandmother had completed first-aid and CPR training, "it wasn't turned in" and Mr. Caggeso did "not have it." *Id.* at 9, 11.

Mr. Caggeso testified that on December 15, 2023, the Agency "disapproved" kinship placement with Paternal Grandmother due to "noncompliance." *Id.* at 4, 12. The Agency mailed Paternal Grandmother notice of the decision and her right to appeal. *Id.* at 12. Paternal Grandmother did not appeal. *Id.*

Appellant cites a single case, ***In the Interest of N.M.***, 186 A.3d 998 (Pa. Super. 2018), to support his claim that "there is a kinship placement [with Paternal Grandmother] that is appropriate and available." Appellant's Brief at 19. In ***N.M.***, this Court concluded "the trial court's repeated refusal to consider **approved** kinship care," where the agency "supported kinship placement with paternal grandmother," was an abuse of discretion. ***N.M.***, 186 A.3d at 1012 (emphasis added). The circumstances are not the same in this case, where Paternal Grandmother was disapproved for kinship care and the Agency did not support the placement.

The juvenile court explained:

[B]ased upon the evidence presented, this [c]ourt found that Paternal Grandmother failed to demonstrate that she was a placement option. Paternal Grandmother was given ample time to obtain the required clearances, in addition to having sufficient time to attend the required trainings. Paternal Grandmother was provided with the information for obtaining the required clearances and for attending the required training if virtual participation was not an option. Paternal Grandmother took no steps to notify the [A]gency of compliance until after the kinship foster study was already completed and denied. Paternal Grandmother was even given an extension because [of C]hild not being in her home. As of the March 22, 2024 hearing, Paternal Uncle's clearances were still incomplete. As such, while Paternal Grandmother might have been able to serve as a less restrictive placement option for [C]hild, Paternal Grandmother did not comply with the [Agency's] requests for [all] clearances. Therefore, the [c]ourt was unable to assess whether she would be an appropriate placement option.

JCO at 6-7.

- 16 -

Thus, the juvenile court did not abuse its discretion in finding that Child's foster home was "the least restrictive placement that met the needs of the Child." *Id.* at 7. For the above reasons, Appellant is not entitled to relief.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/8/2024