J-S18043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 205 WDA 2025 |

Appeal from the Order Dated January 8, 2025
In the Court of Common Pleas of Blair County Juvenile Division at No(s):
CP-07-DP-0000027-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: R.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 206 WDA 2025 |

Appeal from the Order Dated January 8, 2025
In the Court of Common Pleas of Blair County Juvenile Division at No(s):
CP-07-DP-0000002-2024

BEFORE:  DUBOW, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: July 24, 2025**

K.M.M. ("Mother") appeals from the orders dated January 8, 2025, and

filed January 10, 2025,[1] which changed the permanency goals of her sons,

---

[*] Former Justice specially assigned to the Superior Court
[1] While the orders in these matters are noted as filed on the respective juvenile court dockets, the clerk of the juvenile court failed to indicate whether notice
*(Footnote Continued Next Page)*

K.M., born in October 2020, and R.A., born in November 2023 (collectively, "the Children"), from reunification to adoption.[2] The orders further maintained the Children's current foster care placements.[3] After a careful review, we affirm.

We glean the following facts and procedural history of this case from the certified record. This case began on January 7, 2023, after K.M. was removed by the Blair County Children, Youth, and Families ("BCCYF" or "the Agency") from Mother's care and Mother was arrested on charges of endangering the welfare of children ("EWOC"),[4] due to deplorable home conditions. **See**

_____

had been provided. **See** Pa.R.C.P. 236(b) (stating, in relevant part, that "[t]he prothonotary shall note in the docket the giving of the notice[.]"). As such, the orders were never formally entered and the appeal period not triggered. **See** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the decree has been given as required by Pa.R.C.P. 236(b)."). For purposes of clarity, we cite to the filed date of all orders herein.

[2] Neither K.M.'s father, T.C., nor R.A.'s father, J.A., filed an appeal. They also did not participate in the instant appeal.

[3] As an order granting or denying a goal change in a dependency proceeding is appealable, these matters are appropriately before this Court. **See** **_In re H.S.W.C.-B._**, 575 Pa. 473, 478, 836 A.2d 908, 911 (2003); **but c.f. Int. of E.C.,** 251 A.3d 1277, 1283 (Pa.Super. 2021) (concluding that the subject orders denying the father's request for placement change, where a goal change was not requested or addressed, "did not constitute a 'status change' as contemplated in **_H.S.W.C.-B._**"); **see also In Int. of N.M.**, 186 A.3d 998, 1006-07 (Pa.Super. 2018) (finding **_H.S.W.C.–B._** not "controlling" where only a placement change was involved).

[4] Mother faced multiple charges of EWOC, resulting in the removal of two other children who were not subjects of this appeal and were ultimately
*(Footnote Continued Next Page)*

Confirmation of Verbal Order for Emergency Protective Custody (K.M.), 3/30/23, at 1. As recounted by the juvenile court,

> two (2) entrances/exits were totally blocked by clothes and garbage, there was only one (1) useable entrance/exit, the stove was inoperable, the refrigerator was not working and had bugs and rotten food inside of it, the crib for one of the children had food, clothing, and garbage all around it, the apartment was infested with flies and there was garbage strewn throughout, there were toys on the floor, there were potential choking hazards, the older children had no beds and slept on seat cushions, and there were cigarette butts everywhere without any working fire alarm.

***Id.***

Mother ultimately received accelerated rehabilitative disposition ("ARD")[5] for the EWOC charges. As part of her ARD sentence, the court required Mother to, *inter alia*, complete community service, participate in a parenting class, and follow-through on referrals with respect to drug, alcohol, and mental health services. ***See*** Order of Adjudication and Disposition (K.M.), 5/15/23, at 5.

_____

reunified with their fathers. ***See*** Confirmation of Verbal Order for Emergency Protective Custody (K.M.), 3/30/23, at 1. Additionally, as best we can discern, Mother had three more children who were also not in her custody at the time of the subject hearings. ***See*** Permanency Review Orders, 1/10/25, at 7.

[5] Our Supreme Court has explained that "ARD, accelerated rehabilitative disposition, is a pretrial disposition of certain cases, in which the attorney for the Commonwealth agrees to suspend prosecution for an agreed upon period of time in exchange for the defendant's successful participation in a rehabilitation program, the content of which is to be determined by the court and applicable statutes." ***Commonwealth v. Lutz***, 508 Pa. 297, 303, 495 A.2d 928, 931 (1985).

Following removal, K.M. was placed with a maternal aunt and uncle under a safety plan. On March 28, 2023, due to the expiration of the safety plan and Mother's continued lack of appropriate housing, the Agency obtained emergency protective custody of K.M. **See** Confirmation of Verbal Order for Emergency Protective Custody (K.M.), 3/30/23, at 1.

By order dated April 10, 2023, and filed May 15, 2023, the court adjudicated K.M. dependent and established an initial permanency goal of reunification with a concurrent goal of adoption. **See** Order of Adjudication and Disposition (K.M.), 5/15/23, at 1, 3, 5. In furtherance of these goals, the court referred Mother to a four-step reunification program, FICS, that included services related to housing, employment, and parenting.[6, 7] **See id.**, at 5; Agency Exhibit 1, at 1. K.M. remained in kinship care until he was placed in his current foster home in April 2024, where he remained at the time of the subject hearings. **See** Permanency Review Orders, 1/10/25, at 7. Notably, K.M.'s current foster home is not a permanent placement option. **See** Permanency Review Orders, 1/10/25, at 8.

_____

[6] The meaning of the acronym FICS is not evident from the certified record.

[7] T.C. was uninvolved with K.M. and did not participate in the dependency proceedings. As a result, on September 7, 2023, the court made a finding of aggravated circumstances with no requirement of reasonable efforts on the part of the Agency. **See** Permanency Review Orders, 1/10/25, at 7.

- 4 -

The juvenile court has aptly summarized the contemporaneous events surrounding R.A.'s birth and removal from Mother's care as follows:

[In the beginning of 2024, Mother began] a relationship with [J.A.] and was residing with [J.A. and his mother, when she became pregnant with R.A. J.A.] has a long criminal history, [which we discuss further herein,] and the record reflects that [he] had substance abuse issues and there was significant fighting/domestic violence in the . . . home.

At the time of [R.A.]'s birth [in November 2023], a referral was . . . made for preservation services. Shortly after [R.A.] was discharged to [Mother's and J.A.]'s care, [they both] were neglecting [R.A.], were both [actively] using drugs, were involved in domestic violence and [had] not advanced on the housing list. An altercation then occurred on [December 4, 2023] where [Mother] was involved in a fight with [J.A.'s] sister in which [R.A.] was caught in the middle, resulting in a child abuse [investigation] for creating a reasonable likelihood of bodily injury to [R.A.] and resulting in a voluntary safety plan whereby [Mother and R.A.] were to stay with a friend separate from [J.A.]. Despite this, ongoing domestic violence occurred between [Mother and J.A.], and [Mother] was asked to leave the home of the friend. As a result, BCCYF was granted [emergency] custody of [R.A.] on [January 5, 2024], and [R.A.] was placed in [foster care in the home of H.G. and T.G. (collectively, "R.A.'s foster parents"), where he remained at the time of the subject hearings. Pursuant to an order dated January 22, 2024, and filed on January 30, 2024, the court adjudicated R.A. dependent and established an initial permanency goal of reunification and concurrent goal of adoption. In furtherance of reunification, the court required Mother to, *inter alia*, continue with reunification services, as well as those focused on mental health, housing, and employment].

. . .

[Mother] separated from [J.A.] shortly after [R.A.] was placed and was able to get into Huntingdon House (a domestic violence shelter) on [February 2, 2024]. [Mother] was able to make some progress with reunification services while receiving the support of Huntingdon House, but she was ultimately required to leave . . . on or about [July 25, 2024] due to non-compliance. [Notably, a recent paramour, B.M., from whom Mother had separated in June 2024, was arrested on homicide charges in August 2024.].

- 5 -

[S]ince having to vacate Huntingdon House, . . . [Mother] has no prospects for housing and has been denied public housing due to her existing criminal history. She is . . . unemployed and has been unable to obtain a job. [Mother] is still on ARD for her EWOC charges. She was to follow-up with [respect to drug and alcohol and mental health treatment but] has not established any consistent treatment with either and has expressed inconsistent interest with follow through. As a result, she has not made any further progress with . . . reunification and her visitation has been limited to 2 times per week for 3 hours [partially] supervised. FICS . . . indicated that[,] if the goal were not changed to adoption, a referral to a separate provider should be made [due to the length of time Mother was taking to complete their program/services].

. . .

*Id.* at 7-8.

On September 5, 2024, J.A. pleaded guilty to theft and firearms charges "relating to an incident on or about [July 1, 2023] where [he] had stolen a [weapon] from the home of [M.A.]. . . ." *Id.* at 8. He also pleaded guilty to flight, escape, and drug possession charges stemming from a separate incident. *Id.* J.A. was ultimately sentenced to 18-60 months' incarceration and remained incarcerated at the time of the subject hearings. *See id.*; *see also* N.T., 12/19/24, at 3, 7, 9-10; *see also* Agency Exhibit 5.

The court conducted permanency review hearings regarding the Children at regular intervals. At a permanency review hearing conducted on November 26, 2024, and, due to time constraints of the court, continued to December 19, 2024, the Agency requested a change of the Children's permanency goals from reunification to adoption. *See* N.T., 11/26/24, at 1, 8. In connection therewith, the court additionally considered the propriety of

the Children's placements as both R.A.'s foster parents and M.A. and A.A., R.A.'s paternal great uncle and aunt (collectively, "R.A.'s paternal great uncle and aunt"), had each emerged as potential permanent placement options for the Children. *See id.* While Mother opposed the Agency's goal change request, she supported placement of the Children with R.A.'s paternal great uncle and aunt.[8] *See* 11-13. The Children, then four years old and one year old, respectively, were represented by a guardian *ad litem*, Matthew Dombrosky, Esquire.

The Agency did not present testimonial evidence but introduced numerous exhibits, which the court admitted. *See* N.T., 11/26/24, at 4-8; *see also* Agency Exhibits 1-6. These exhibits included a report from FICS; a Bair/Path House report regarding R.A.'s visitation with his paternal great uncle and aunt; Pressley Ridge[9] reports regarding R.A.'s foster parents and R.A.'s paternal great uncle and aunt; and criminal dockets as to Father, Mother, and Mother's former paramour. The guardian *ad litem* presented the testimony of R.A.'s foster parents. Mother, who was present and represented by counsel, adduced photographs, which the court admitted following her testimony.[10]

---

[8] J.A. did not oppose the requested goal change. *See* N.T., 11/26/24, at 12.

[9] Pressley Ridge is the agency responsible for administering and certifying the Children's placements. *See* Agency Exhibit 3.

[10] Mother's testimony was limited to the authentication of her proffered photographs. *See* N.T., 11/26/24, at 60-65.

*See* N.T., 11/26/24, at 64. Further, J.A., who was represented by counsel, testified on his own behalf *via* telephone from prison on December 19, 2024. J.A. also presented the testimony of R.A.'s paternal great uncle and aunt.

The testimony at the hearings indicated that R.A.'s foster parents had begun serving as a respite resource for K.M. on weekends about five weeks prior to the subject hearings. *See* N.T., 11/26/24, at 24. They expressed their desire to serve as an adoptive resource for the Children. *See id.* at 23-24, 26, 55. Concomitantly, this testimony reflects that R.A.'s paternal great uncle and aunt commenced bi-weekly visitation with R.A. in May 2024, and they also wished to be a permanent placement resource for both children. *See* N.T., 12/19/24, at 18, 21-22, 33-34. Visitation was not yet established between K.M. and R.A.'s paternal great uncle and aunt. *See id.* at 19. Pressley Ridge completed the requisite home studies for R.A.'s foster parents as well as R.A.'s great uncle and aunt. *See* Agency Exhibit 3.

By orders dated January 8, 2025, and filed January 10, 2025, the juvenile court changed the Children's primary permanency goals from reunification to adoption, with concurrent goals of subsidized permanent legal custody ("SPLC").[11] *See* Permanency Review Orders, 1/10/25, at 4. The

_____

[11] SPLC has been explained by this Court as

> an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian. Parental rights are not terminated. The custodian is

*(Footnote Continued Next Page)*

court maintained custody of the Children with the Agency and continued the Children's existing foster placements. *See id.* at 8-9. The court further preserved visitation between R.A. and R.A.'s paternal great uncle and aunt. *See id.* at 11. In so doing, the court found Mother to be in moderate compliance with her permanency goals but to have made no progress toward alleviating the circumstances that brought the Children into care. *See id.* at 2.

On February 5, 2025, Mother filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on March 17, 2025. By letter dated February 20, 2025, the juvenile court advised that it relies upon the reasoning set forth in the subject orders in lieu of filing a Rule 1925(a) opinion.

On appeal, Mother raises the following issues for our review:

I. Whether the trial court erred and/or abused its discretion in changing the goal to adoption with regard to Mother . . . as the record reflects that Mother showed progress with reunification services[?]

II. Whether the trial court erred and/or abused its discretion in not changing the placement of the Children . . . to be with family members of R.A.[?]

---

typically provided a financial subsidy for the child by the local county children and youth agency. . . .

*In re S.H.*, 71 A.3d 973, 978 (Pa.Super. 2013), *appeal denied*, 80 A.3d 778 (Pa. 2013) (internal citation omitted) (footnote omitted); *see also* 42 Pa.C.S.A. § 6351(a)(2.1).

Mother's Brief at 5 (suggested answers and unnecessary capitalization omitted).

It is well-settled that "[o]ur standard of review concerning a juvenile court's permanency determination is an abuse of discretion." *Interest of J.B.*, 296 A.3d 1234, 1238 (Pa.Super. 2023) (citing *In re A.B.*, 19 A.3d 1084, 1088 (Pa.Super. 2011). This requires "an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record[] but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.,* 608 Pa. 9, 26, 9 A.3d 1179, 1190 (2010) (citation omitted). Our High Court has explained:

> Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*Id.* at 27, 9 A.3d at 1190.

Permanency goal change proceedings are governed by the Juvenile Act, 42 Pa.C.S.A. §§ 6301-75. Significantly, ". . . the Juvenile Act . . . was amended in 1998 to conform to the federal Adoption and Safe Families Act

("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." **J.B.**, 296 A.3d at 1238 (citation omitted). Consistent therewith, "the focus of dependency proceedings, including change of goal proceedings, [is] on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents." **Id.** (citation omitted) (emphasis in original). Therefore, "[w]hile parental progress toward completion of a permanency plan is an important fact, it is not to be elevated to determinative status, to the exclusion of all other factors." **In re M.T.**, 101 A.3d 1163, 1175 (Pa.Super. 2014). In short, "a child's life cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **In re N.C.**, 909 A.2d 818, 824 (Pa.Super. 2006).

Specifically, 42 Pa.C.S.A. § 6351(f) mandates that a trial court consider a number of discrete factors in adjudicating a goal change petition including, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the appropriateness, feasibility, and extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) the likely date by which the goal for the child might be achieved; (6) the

child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. *See J.B.*, 296 A.3d at 1238-39 (citation omitted); *see also* 42 Pa.C.S.A. § 6351(f)(1)-(5), (6), (9).

In changing the Children's permanency goals to adoption, the juvenile court found that the Children "remain without proper parental care and control by [their parents]. There is no indication that any of the parents can provide[] a safe, stable environment for any of their children in the [foreseeable] future." *See* Permanency Review Orders, 1/10/25, at 8. The court highlighted, *inter alia*, Mother's unpredictable housing and tumultuous lifestyle since her separation from Huntington House. *See id.* at 8.

In her first issue, Mother argues that the court abused its discretion in changing the Children's primary permanency goals from reunification to adoption with a concurrent goal of SPLC. Mother asserts that she has progressed by complying with the objectives set forth in her permanency plan, including, but not limited to, being consistent with supervised visits. Specifically, Mother asserts that she

> made more than enough progress, much more progress than was required to reverse the goal change in [*In the Interest of A.W.*, 162 A.3d 1117 (Pa.Super. 2017)] to keep the goal [to] return home. BCCYF did not meet its burden either of proving the goal change was in the best interest of the [C]hildren.

Mother's Brief at 21-22.

In support of her argument, Mother relies upon *A.W.*, *supra*, wherein this Court reversed an order changing the child's goal from reunification to

- 12 -

adoption with a concurrent goal of SPLC, and the father appealed.  In that case, the father made increasing progress toward reunification in the five months after his release from incarceration.  In particular, in the month prior to the hearing, the father was released from a halfway house and moved closer to the child, re-established reunification services, participated in a supervised visit, and obtained employment.  *See A.W.*, 162 A.3d at 1122–23.

Upon review, we conclude that *A.W.*, *supra*, is inapposite.  We also find no merit in Mother's arguments that she has made sufficient progress to forestall the subject goal change.  Although Mother initially made advancements toward reunification, the certified record indicates that her progress regressed following her separation from Huntington House in July 2024.  Thereafter, she went through a series of temporary housing situations that failed to yield any independent, long-term prospects.  *See* Agency Exhibit 1.  She also had no employment.  *See id.*  During this time-period, Mother also continued to associate with those with violent criminal backgrounds, as evidenced by her relationship with her recent paramour, B.M.  *See id.*; *see also* N.T., 11/26/24, at 28, 56-57; *see also* Agency Exhibit 6.  Likewise, J.A. confirmed that he had discussions with Mother about resuming their relationship, which had been plagued by domestic violence, upon his release from jail.  *See* N.T., 12/19/24, at 8.

Furthermore, since her separation from Huntington House in July 2024, Mother's participation with reunification services and visitation decreased. *See* Agency Exhibit 1. Her visits with the Children regressed from six-hour visits in her home with "check-in" supervision to partially supervised visits for three hours at the FICS office. *See id.* Additionally, Mother failed to engage in mental health services, and she failed to complete the community service requirement of her ARD sentence. *See id.* As such, the FICS report indicated that, while Mother had progressed to the third step of its 4-step program, they did not anticipate her timely completion. Specifically, the FICS report explained, "It typically takes a family 6-12 months to reunify through FICS' Reunification Program and [Mother] is currently in her 15th month with FICS. It would take approximately 6 more months, at minimum, for her to reunify if the goal remained reunification." *Id.* FICS therefore recommended referral to a new provider should the court maintain a permanency goal of reunification. *See id.*

Based upon the foregoing, Mother's arguments pursuant to *A.W.* fall short. Unlike the parent in that case who demonstrated significant progress towards reunification in the weeks immediately preceding the entry of a goal change order, Mother has simply not displayed commensurate progress. After nearly two years and one year, respectively, the Children remained in care without reunification. Indeed, Mother regressed in the months immediately

prior to the subject hearings. As such, the juvenile court did not abuse its discretion.

We emphasize that "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **N.C.**, 909 A.2d at 824. The Children are entitled to permanency and stability. Accordingly, as the record supports the determination that it is in the Children's best interests for their permanency goals to be changed to adoption, we conclude that Mother's first claim is without merit.

Turning to her second issue, Mother assails the juvenile court maintaining the Children's placements in their respective foster homes, rather than placing them with R.A.'s paternal great uncle and aunt. Mother asserts,

> [T]he [C]hildren should have been placed with the family members of R.A. under the law. BCCYF should have looked to family first for placement, as required. The family was an approved foster care placement who had developed a relationship with R.A. That was the [A]gency's plan, until that plan suddenly changed for no real reason. Further, the [c]ourt should have placed the [C]hildren there, as they are family, and both parents requested that to occur. The [juvenile c]ourt erred and/or abused its discretion in not placing the boys there.

Mother's Brief at 26.

"Once a child has been adjudicated dependent, the issue of custody and continuation of foster care are determined according to a child's best interest." **N.M.**, 186 A.3d at 1001 n.8 (citing **In re R.P.**, 957 A.2d 1205, 1220-21 (Pa.Super. 2008)). Along with reunification and adoption, the court may decide to place the child with a legal custodian or a fit and willing

- 15 -

relative if reunification and adoption are not in the child's best interests. 42 Pa.C.S.A. § 6351(f.1)(1)-(4). Section 6351(g) provides, in pertinent part, that "[o]n the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S.A. § 6351(g).

Further, as it relates to kinship care, 67 Pa.C.S.A. § 7507 provides, in relevant part:

**§ 7507. Kinship Care Program**

. . .

**(c) Placement of children.--**If a child has been removed from the child's home under a voluntary placement agreement or is in the legal custody of the county agency, the county agency shall give first consideration to placement with relatives or kin. The county agency shall document that an attempt was made to place the child with a relative or kin. If the child is not placed with a relative or kin, the agency shall document the reason why the placement was not possible.

. . .

67 Pa.C.S.A. § 7507. We further explained:

"[K]inship care is a subset of foster care where the care provider already has a close relationship to the child. In kinship care (as with foster care generally), legal custody of the child is vested in [the Agency]. [The Agency] then places the child with the care provider." ***In re J.P.,*** 998 A.2d 984, 987 n. 3 (Pa.Super. 2010). The court may place children with a foster family, although there might be willing relatives, where foster care is in the best interests of the children or aggravated circumstances exist. . . . The goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of children[] but must

- 16 -

be weighed in conjunction with other factors. *In re Davis*, 502 Pa. 110, 125, 465 A.2d 614, 621 (1983).

*In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa.Super. 2011).[12]

In preserving the status quo with regard to the Children's placements, the juvenile court reasoned as follows:

> Notwithstanding the importance of the question of placement, the [c]ourt believes that it is best for the status quo to remain pending any Agency action on a [p]etition for [i]nvoluntary [t]ermination being filed. The future juvenile hearing officer proceedings, [termination of parental rights proceedings] and possible adoption proceedings will occur at the appropriate timing of this decision. Absent an indication that the current caregiver is immediately unwilling to care for [the Children], this court declines to change placement[s] pending those proceedings.

Permanency Review Orders, 1/10/25, at 8. Thus, the juvenile court concluded that it was in the Children's best interests to maintain their placements.

With respect to Mother's contention that R.A.'s paternal great uncle and aunt were not properly considered as a potential kinship resource, the certified record indicates that they initially identified themselves to the Agency as a potential resource for R.A. in January 2024, following his placement in foster care. *See* N.T., 12/19/24, at 13. Thereafter, visitation was established between R.A. and his paternal great uncle and aunt in May 2024. *See* Agency Exhibit 2. Subsequent to a referral from the Agency in September 2024, Pressley Ridge ultimately completed a homestudy in October 2024 and a home

---

[12] We observe that *G.R.L.* addresses a prior version of the kinship program statute, which had substantially similar provisions. *See G.R.L.*, 26 A.3d at 1127.

inspection in November 2024. *See* Agency Exhibit 3. Notwithstanding, as early as June 2024, the Agency noted R.A.'s paternal great uncle and aunt as a potential placement option for R.A., pending completion of a homestudy. By September 2024, this included consideration of R.A.'s paternal great uncle and aunt as a placement option for K.M. as well. *See* Motion for Permanency/Dispositional Review Hearing, 6/3/24; Motion for Permanency/Dispositional Review Hearing, 9/13/24. Thus, to the extent that Mother claims that the Agency failed to appropriately consider kinship placement as required by Section 7507(c), we find no merit in her contention.

Our review also reveals adequate evidentiary support for the juvenile court's findings with respect to placement.

As indicated *supra*, the record reveals that R.A. had been placed with his foster parents for nearly a year, practically his entire young life, at the time of the subject hearings. *See* N.T., 11/26/24, at 20. R.A.'s foster mother reported that he was doing well in the home. He gets along with the four other children in home "very well" and is "very attached" to the family. *Id.* at 20-22. She testified that R.A. is "part of our family." *Id.* at 29. She further stated, "[H]e feels like a son to us. We love him just like we love our own kids . . . ." *Id.* R.A.'s foster parents expressed a clear desire to adopt R.A. *See id.* at 23-24. Notwithstanding, R.A.'s foster mother testified that she and her husband were open and willing to form a relationship with R.A.'s parents,

as long as it was safe and healthy. ***See id.*** at 23, 32-33. This was confirmed by R.A.'s foster father. ***See id.*** at 59.

Additionally, R.A.'s foster mother recounted that she and her husband had recently been providing respite care to K.M., who had been removed from Mother's care for almost two years and formally placed in foster care for over one and one-half years, on weekends for about five weeks. ***See id.*** at 24. She indicated that such care had gone well. ***See id.*** at 24-27. K.M. is "comfortable" and "enjoys" his time with the family. ***See id.*** at 30-31. Given that this respite care had gone well, R.A.'s foster parents also wished to be considered as an adoptive resource for K.M. and obtained the necessary waiver for him to be placed in the home. ***See id.*** at 26, 29; ***see also*** Agency Exhibit 3. As noted above, K.M.'s current foster placement is not permanent.

Conversely, as indicated, R.A. had only been engaged in bi-weekly visitation with his paternal great uncle and aunt since May 2024. Visitation had not yet been established between K.M. and R.A.'s paternal great uncle and aunt. ***See*** N.T., 12/19/24, at 18-19; Agency Exhibit 2. There had also been a persistent issue of smoking in the home of R.A.'s paternal great uncle and aunt. ***See*** N.T., 12/19/24, at 27; ***see also*** Agency Exhibit 3. Moreover, J.A. had stolen a firearm from the home of R.A.'s great uncle and aunt, one of the reasons for his incarceration at the time of the subject hearing. ***See*** N.T., 12/19/24, at 10, 29.

In contrast to R.A.'s foster parents desire to adopt the Children, Ashley Hollen of Pressley Ridge testified that R.A.'s paternal great uncle and aunt had expressed a preference for SPLC, as opposed to adoption, of the Children. *See id.* at 21-22, 33; Agency Exhibit 3. Although R.A.'s paternal great uncle testified to his current preference for adoption, R.A.'s paternal great aunt testified that she continues to favor SPLC. *See* N.T., 12/19/24, at 22-23, 34. Relatedly, as recounted by R.A.'s foster mother, Mother had also initially been against placement of the Children with R.A.'s paternal great uncle and aunt. *See* N.T., 11/26/24, at 33-34.

Finally, Kylie Imler, Pressley Ridge treatment coordinator, recommended R.A. remain with his foster parents and that K.M. also be placed there. *See* Agency Exhibit 3. Ms. Imler asserted that they can provide "a safe and nurturing environment" for both children. *Id.* She emphasized that R.A. had been placed in the home since January 2024; it is "all he knows." *Id.* As such, if R.A. were removed, she opined that "it would be more detrimental to him as he is bonded with them at such a young age and he knows nothing else." *Id.*

Thus, the record corroborates the juvenile court's determination that maintaining the Children's foster placements was in their best interests, and we discern no abuse of discretion. Critically, the record establishes that the court in fact considered R.A.'s paternal great uncle and aunt as a potential placement option for the Children. Mother's second claim therefore also fails.

For the foregoing reasons, we affirm the orders changing the Children's permanency goals from reunification to adoption and maintaining the Children's current foster care placements.[13]

Orders affirmed. Application for Discontinuance Denied.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/24/2025

---

[13] On July 1, 2025, Mother filed an application requesting that this Court discontinue these appeals. Mother did not allege any particular grounds for the discontinuance and cited no legal authorities in support of her request. **Cf.** Pa.R.A.P. 123(a) (requiring that an application must "stated with particularity the grounds on which it is based" and stated "the relief demanded"). For Mother's benefit, we note that discontinuances of appeals are governed by Pa.R.A.P. 1973. Our brethren in the Commonwealth Court have declined to discontinue appeals where an appellant fails to state with particularity the grounds upon which a discontinuance is being sought. **See Lowery v. East Pikeland Twp.**, 599 A.2d 271, 273 (Pa.Cmwlth. 1991) (citing Pa.R.A.P. 123(a), 1973). We may rely upon the holdings of the Commonwealth Court for their persuasive value. **See Petow v. Warehime**, 996 A.2d 1083, 1089 n.1 (Pa.Super. 2010). Under the circumstances presented in this case, we decline to grant Mother's bald application for a discontinuance. **See Lowrey**, 599 A.2d at 273.